No. 86,098

STATE OF KANSAS, *Appellee*, v. STEVEN K. BLOOM, *Appellant*.

(44 P.3d 305)

Opinion filed April 19, 2002

*Stephen B. Chapman,* of Kansas City, argued the cause and was on the brief for appellant.

*Robert D. Hecht,* district attorney, argued the cause, and *Deborah L. Hughes,* assistant district attorney, and *Carla J. Stovall,* attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: Steven Bloom appeals his conviction of second-degree intentional murder and sentence of life in prison, claiming (1) prosecutorial misconduct deprived him of his rights to due process and a fair trial; (2) the trial court improperly admitted evidence of a threat made by defendant upon the victim's sister; (3) the trial court denied him of his constitutional right to confront witnesses; (4) the trial court erred in allowing the State to show the jury a photo during cross-examination; (5) the presence of a plain-clothes security guard denied him of his right to a fair trial; (6) he was denied his statutory and constitutional rights to due process and speedy trial; and (7) the State was improperly allowed to endorse an additional witness.

In the early morning hours of October 14, 1998, police were dispatched to Bloom's residence following a 911 call in which the male caller stated, "I just killed a thief that attacked me in my house, man." Within minutes, an officer arrived at the scene and

observed Brenda Porter running out of Bloom's house screaming. Brenda told the officer that Bloom had shot and killed her sister Deanna Porter. The officer then saw Bloom exit the house with blood on his legs. The officer ordered Bloom to get on the ground and handcuffed him. Additional officers arrived at the scene.

Upon entering Bloom's house, officers observed Deanna Porter lying on the floor between the living room and kitchen covered by a sheet. Upon lifting the sheet, the officers observed the victim had sustained a massive gunshot wound to the head. The officers observed a butcher knife in the victim's right hand, with the sharp edge pointed toward her body and only a small amount of blood on the blade. The officers also observed a shotgun, with its barrel pointed toward the living room, and one officer indicated he observed a shotgun shell lying on the ground next to the victim's body.

After Bloom gave written consent to search his home, officers investigating the scene observed a shotgun shell lying in the living room next to the couch. They also observed blood spatter and marks from the shotgun pellets on the wall, indicating the shotgun had been fired from the living room into the kitchen area. The victim's purse was lying next to the victim's right hand. Officers opined that the purse, not the knife, had been in the victim's right hand when the shot was fired. The 12-gauge semiautomatic shotgun at the scene contained three additional rounds of ammunition, the first of which matched the shell found on the ground. Additional ammunition, also matching the empty shell at the scene, was discovered on a closet floor in a bedroom of the house.

Bloom, who had a cut on the calf of his leg, was taken to the hospital to receive treatment. The officer who rode with Bloom to the hospital stated that Bloom had spontaneously asked the officer to shoot him, Bloom. Bloom told the officer that Deanna had come at him with a knife. He stated that he had asked her to marry him 12 or 15 times. Bloom then stated that she was jealous because he had a new girlfriend and had come at him with a knife. Bloom asked the officer to tell him that Deanna was not dead. He stated that he had given her money for dope, but refused to give her any more. On the way to the law enforcement center Bloom also asked, "I just shot her in the hand, right?" The officer noted that Bloom

smelled of alcohol but was unaware if Bloom was intoxicated. Another officer stated that prior to arriving at the law enforcement center Bloom had spontaneously stated, "[S]he should have married me if she didn't want me seeing any other women."

During a taped interview with police, Bloom indicated that he and Deanna had had a relationship for approximately 3 years and had engaged in sexual relations once every 8 or 9 months. Bloom stated that he had asked Deanna to marry him on numerous occasions, but that she had declined.

Bloom told police that Carol Miller was at his house when Deanna arrived earlier in the evening. Bloom stated that he had gone out and purchased a rock of crack cocaine and that he gave some of it to Deanna and kept some for himself. Bloom indicated that they smoked crack and drank beer and gin. After a few hours, Carol left. Deanna said something to Bloom about "those other bitches," which Bloom thought was directed at his part-time girlfriends, went to the kitchen, grabbed a knife, and cut Bloom on his leg. She then attempted to cut him in the groin area. Bloom stood up, pushed her away, grabbed a shotgun that was near the refrigerator, and blew her hand off. Bloom estimated he was approximately 2 feet away from Deanna when he fired the shot.

Later in the interview, Bloom indicated that he had tried to shoot Deanna in the neck or shoulder, finally admitting that he had tried to shoot at any part of her. Bloom stated that he had covered Deanna up with the sheet and called 911. Bloom explained that he had described Deanna as a thief in the 911 call because she had stolen a lighter from him earlier in the week. Bloom also admitted to police that he had placed the knife back in Deanna's hand after she fell, because it had skidded across the floor during her fall. During the interview, Bloom denied all suggestions by the police that he had cut himself on the leg.

Bloom was charged with one count of second-degree intentional murder on October 15, 1998. The complaint was amended to charge Bloom with first-degree premeditated murder on November 19, 1998. Bloom's trial began June 26, 2000.

Markale Porter, Deanna's brother, testified that he and his uncle, Stanley Henderson, were at Bloom's house earlier in the eve-

ning with Deanna, Bloom, Carol Miller, and Bloom's next door neighbor. At some point, Markale and Stanley left for approximately 45 minutes to purchase some crack cocaine. Upon their return, Markale and Stanley divided up the cocaine between themselves, Bloom, Deanna, and Carol. Bloom became agitated when he could not find his crack pipe. He became more agitated after he thought Deanna's pipe was his, but she indicated that it was hers. Bloom then ordered everyone to leave his house. Everyone but Bloom left. Deanna, Markale, and Stanley went to Brenda's house, just across the street, and sat on her porch.

Markale and Brenda testified that later Deanna returned to Bloom's house and was admitted. About 5 to 8 minutes later, they heard a gunshot. Markale and Stanley ran to Bloom's house. Brenda went inside her house to call Bloom. After Markale and Stanley were unable to gain entry to Bloom's house, they returned to Brenda's house. When Brenda was unable to get an answer on the phone, she ran to Bloom's house. Brenda testified that when Bloom answered the door, he told her that Deanna was "up on the floor dead. I just killed her." Brenda observed Deanna lying uncovered on the upstairs floor. Brenda believed that while she was upstairs with Deanna, Bloom was downstairs. Markale testified he had observed Bloom come out of his house with a bleeding wound on his leg and tell Brenda that he had blown Deanna's head off. Markale admitted on cross-examination that he had not said anything about hearing Bloom make this statement prior to the preliminary hearing.

Brenda had known Bloom for the past 4 years and visited his house frequently. She indicated that Deanna and Bloom were friends and that Bloom would treat Deanna good sometimes but that other times he would get angry and ask her to leave his house. She testified that Bloom liked Deanna as more than a friend, but that Deanna did not feel the same about him. Brenda testified that she had been over at Bloom's house earlier that evening, with Deanna, Bloom, Carol, and Bloom's next door neighbor. Brenda had left after about 30 minutes and returned to her house after Bloom had asked her to leave.

Brenda testified that a week before Deanna's death, Bloom had threatened to kill Brenda by choking her with his toes if she lied to him about a man he suspected Deanna was seeing. Brenda stated that Bloom was very angry and jealous when he made this threat. Bloom often bragged about being able to kill people with his own hands. After Deanna died, Bloom sent letters to Brenda asking Brenda's family to forgive him and saying that he did not mean to murder Deanna.

Ruth Porter, Deanna's mother, testified to the relationship between Bloom and Deanna. Bloom had called Ruth within a couple of months before Deanna's death and had told her that he loved Deanna, but that Deanna had said there could be no relationship because she did not have relationships with white men. Ruth testified that in the past Bloom had wrongfully accused Deanna of stealing from him and later realized she did not do it.

The cause of Deanna's death was a gunshot wound to the head. No other internal or external injuries were discovered. The shot was fired within a few feet of her head because stippling from the bits of powder was observed. Deanna tested positive for cocaine and alcohol.

Michael VanStratton, a KBI forensic scientist, testified regarding the blood spatter at the scene. He testified that the victim was in the living room facing the kitchen at the time she was shot. He indicated that the victim was not sitting down nor was she in a full upright position when the shot was fired. He testified that the shooter was either in the living room or in close proximity to it when the shot was fired.

Carol Miller, Bloom's friend of 6 years, testified she was at Bloom's house that evening drinking beer with Bloom and Deanna, and that no "men" had shown up at the house during this time. After about 3 or 4 hours, Carol testified she left and that Deanna stayed. Deanna had told Carol she was going to be leaving to go to Brenda's house. On cross-examination, Carol admitted that Bloom's next-door neighbor, a male, might have been there that evening, but that she did not remember.

John Sims, a social worker and addictions counselor, testified generally for the defense on the effects of cocaine and alcohol,

stating that the combination of the two can impair the ability to think and can impair reality. Sims also testified as to blackouts and how individuals can be in a blackout and still be functioning.

Bloom, testifying in his own defense, stated that he had warned Brenda earlier in the evening that he was tired and that he did not want Brenda to come over to his house. He said that Carol Miller showed up later in the evening and that he had let her in because he had not seen her in awhile. After a few minutes, Deanna arrived. The three of them drank beer and gin. Brenda came over later that evening, followed by Markale and Stanley. Bloom did not admit Markale and Stanley into his house. He told them to leave and they left. After the women finished their drinks, he told them to leave. The women left and Bloom tried to go to sleep. Bloom testified that he put the shotgun by the refrigerator at that time. Bloom said that he puts the gun by the refrigerator when he is home alone.

Bloom testified he had trouble getting to sleep, and suddenly realized Deanna was standing in front of him. Bloom did not recall how Deanna had entered the house. Bloom said that Deanna asked him for $40 to buy two pieces of crack cocaine. When he refused, Deanna threatened him by saying that she had back up. When Bloom again refused to give her any money, Deanna bumped her chest against him. Bloom backed away from her and sat down in a chair in the kitchen. Deanna walked past him and said, "[I]f it weren't for them fucking bitches," and then came at him with a knife. After she cut his leg, he pushed her against the refrigerator. As he started to back away, he grabbed the shotgun. While backing toward the front door he tripped over something and the shotgun went off. When the gun went off, Bloom said that Deanna was sitting down in a chair. Bloom then went over to Deanna, laid the gun down, and observed no damage to Deanna's body at that time. Bloom was shocked the gun fired because there was not supposed to be ammunition in the firing chamber. When Brenda arrived, Bloom told her he had shot Deanna.

Bloom testified that he cannot handle stress because he suffers from post-traumatic stress disorder and that he shuts down in stressful situations. Bloom is retired from the military and suffered physical injuries during the Vietnam War. He testified he had no

recollection of anything that occurred after he told Brenda he had shot Deanna until he was being handcuffed by police. Bloom denied remembering being transferred to the hospital or to the law enforcement center.

After denying to the jury that he intentionally shot Deanna, Bloom described his relationship with Deanna as being that of friends. He denied stating that they had sexual relations once every 8 or 9 months. Instead, Bloom testified he and Deanna had been involved in a 9-month relationship, but had since gone back to being friends. Bloom admitted he wanted Deanna to be his girlfriend, but claimed he had given up on the idea. He denied having ever asked Deanna to marry him and claimed that he lied to the police about this because he wanted to make her look good and did not think Deanna was dead at that time.

Bloom did not recall making the 911 call. He explained to the jury that he had described Deanna as a thief during that call because she had tried to extort $40 from him to buy crack cocaine. Bloom stated that he did not know she was dead so he put the knife back in Deanna's hand to protect her.

Bloom was convicted of second-degree intentional murder, an off-grid crime. Bloom's posttrial motions to set aside the verdict, for a new trial, for a mistrial, and for a judgment of acquittal were denied. Bloom was sentenced to life in prison with eligibility of parole after 10 years. Timely notice of appeal was filed. This court's jurisdiction is pursuant to K.S.A. 22-3601(b)(1).

## PROSECUTORIAL MISCONDUCT

Bloom contends the prosecutor wilfully violated an order in limine that prohibited the State from introducing letters Bloom had written to Deanna. The State maintains that it did not violate an order in limine, nor did it commit prosecutorial misconduct.

Prior to trial, Bloom filed a motion in limine seeking to exclude any reference to his prior convictions and bad acts. On the day of trial, the trial court granted an order in limine as to any prior convictions. During the State's case in chief, the prosecutor asked Ruth Porter about letters Bloom had written to Deanna, and then attempted to introduce a letter into evidence. Outside the hearing

of the jury, Bloom objected to the introduction of the letter into evidence, asserting that the letter had been written while Bloom was in jail and that it would violate the order in limine. At that time, the prosecutor indicated the purpose for introducing the letter was to admit into evidence a statement by Bloom to the effect that if there are not dead bodies littering the street then Bloom did not try to kill anyone. The trial judge held the letter was inadmissible because it violated the order in limine and that if the letter were redacted down to one specific statement it would not have probative value.

During Bloom's cross-examination by the prosecutor, the following exchange occurred:

"Q.: [Prosecutor]: You are an expert in M-16 rifles, correct?
"A.: [Bloom]: Yes, ma'am.
"Q.: And isn't it true that you believe yourself to be good enough with weapons that if there are dead bodies, they are there on purpose because you intended to kill them?
"A.: There can be dead bodies without intention. No, that is—no, I don't believe that.
"Q.: Specifically with respect to you, if there are dead bodies around you, you intended to kill them?
"A.: Absolutely no.
"Q.: Isn't it true that you wrote a letter to Deanna—."

At that point, Bloom's counsel approached the bench and requested a mistrial because this evidence had specifically been excluded earlier in the trial. The prosecutor urged the court that this particular statement was now relevant to prove Bloom's intent. The trial judge agreed with the defense, but denied defendant's motion for a mistrial because the contents of the letter had not been revealed to the jury. Bloom was convicted.

Bloom again raised the issue of prosecutorial misconduct in a motion for new trial. In denying Bloom's motion for a new trial, the trial court held there was no "true violation of the rule in limine," because "the gist of the letters did not become evidence for the jury to consider." The prosecutor argues there was no violation of an order in limine because Bloom's motion in limine did not identify the letter as a specific piece of evidence to be excluded.

A two-part test is used in evaluating an alleged violation of a motion in limine. First, it must be determined whether a violation occurred. Second, if a violation occurred it must then be determined whether the facts elicited during the violation substantially prejudiced the defendant. The defendant bears the burden of showing he or she was substantially prejudiced. *State v. Aikins,* 261 Kan. 346, 376, 932 P.2d 408 (1997); *State v. Warden,* 257 Kan. 94, Syl. ¶ 9, 891 P.2d 1074 (1995).

In Kansas, a court's power to consider a motion in limine arises from its statutory pretrial authority. *State v. Quick,* 226 Kan. 308, 311, 597 P.2d 1108 (1979) (disapproved on other grounds); see K.S.A. 22-3217; K.S.A. 2001 Supp. 60-216. An order in limine is to insure that evidence inadmissible at trial is not offered, because the mere offer of or statements about such evidence would tend to prejudice the jury. *State v. Heath,* 264 Kan. 557, 581, 957 P.2d 449 (1998). The *Quick* court set forth the following guidelines in using a motion in limine:

> "It is important that a proper written motion be filed to pinpoint the material or evidence to be protected against. This is necessary together with an order of the court setting forth the specific basis for exclusion or admission. . . . The motion should not be general in scope. [Citation omitted.]
>
> "When entering the order it should be temporary in nature. It is entered before trial and no one knows exactly what will turn up later during the trial. When a protective order has once been granted the offer of proof during the course of the trial must be made in the absence of the jury." 226 Kan. at 312.

Here, when the State first alluded to the letter during direct examination of Ruth Porter, the order in limine did not specifically extend to the letter. However, after an objection by the defense, the trial judge precluded admission of the letter as a violation of the order in limine because it alluded to a prior conviction. At that point, the prosecutor was on notice that this letter was included in the order in limine. When the prosecutor subsequently mentioned the letter during Bloom's cross-examination, the prosecutor asserted that the court's prior ruling excluded the letter but did not exclude that particular statement. Although the trial judge did refer to this particular statement differently and appeared to have recognized that the statement itself did not violate the order in limine,

the admission of this statement had still been precluded for lack of probativeness. In its brief, the State asserts the statement about the dead bodies became probative after Bloom changed his defense during his testimony from self-defense to that of accident. We note that even if the State believed the statement became probative at that point, the prudent thing would have been for the prosecutor to have requested admission of this statement outside the jury's presence.

Bloom contends he was prejudiced because the jury heard the prosecutor ask him about a letter he wrote to Deanna and that the jury had to know that the prosecutor was about to show that Bloom had lied in his response to the prosecutor's question about the dead bodies. Even if this contention is true, Bloom fails to show what substantial prejudice resulted from the State's violation of the order in limine. See *Aikins*, 261 Kan. at 376. The contents of the letter were never admitted into evidence. Thus, the trial court was correct in denying the request for a mistrial.

Bloom next asserts that he is entitled to have his conviction set aside because of prosecutorial misconduct in cross-examining him about the letter. In order for prosecutorial misconduct to constitute reversible error, the error must be of such magnitude as to deny a defendant his constitutional right to a fair trial. *State v. Pabst,* 268 Kan. 501, 504, 996 P.2d 321 (2000). Three factors should be considered in determining whether to grant a new trial because of a prosecutor's violation of an order in limine. First, was the prosecutor's misconduct so gross and flagrant as to prejudice the jury against the defendant? Second, does the admission of the statement indicate ill will by the prosecutor? Third, is the evidence against the defendant so overwhelming that there was little or no likelihood the prosecutor's violation of the order in limine changed the result of the trial? *State v. Crume,* 271 Kan. 87, Syl. ¶ 11, 22 P.3d 1057 (2001).

Bloom asserts the prosecutor's "hyper-technical claim" that although the letter was precluded from evidence this particular statement in the letter was not precluded, demonstrates the prosecutor's ill will. Bloom argues that the prosecutor's questioning regarding this statement was based on inadmissible evidence and

thus the questioning was made in bad faith. Bloom contends the reference to the dead bodies by the prosecutor caused the jury wonder what Bloom was hiding. Bloom asserts that the error was compounded when the trial court failed to instruct the jury to disregard this reference. We note that the record does not indicate Bloom requested an admonishment.

Bloom is correct in stating that the credibility of his version of the shooting was a critical element in the trial. However, after reviewing the circumstances surrounding the prosecutor's statement and the evidence at trial, it can be said that the prosecutor's statement had little, if any, likelihood in changing the result of the trial. The evidence as to Bloom's intent was not overwhelming; however, Bloom's credibility was damaged by his own actions and inconsistent statements. After reviewing the record, we find that Bloom's rights to due process and a fair trial were not violated.

## EVIDENCE OF DEFENDANT'S THREAT TO ANOTHER

Bloom contends the trial court denied him his rights to due process and a fair trial in allowing Brenda Porter to testify to a threat Bloom had made to her approximately a week before Deanna's death. Bloom argues the admission of the evidence was erroneous and irrelevant and that it violated K.S.A. 60-447 and K.S.A. 60-455.

The threat was first brought to the trial court's attention when considering Bloom's motion in limine. At that time, the trial judge denied the motion in limine as to the threat. During direct examination of Brenda, the prosecutor inquired whether there was a conversation with Bloom which scared her about a week before Deanna's death. Out of the hearing of the jury, Bloom objected, claiming that admission of this testimony violated K.S.A. 60-455. The prosecutor then proffered testimony to show the relationship between Bloom and Deanna and Bloom's jealousy of Deanna and argued the testimony showed motive and intent. The trial judge overruled Bloom's objection.

Brenda testified that she had gone to Bloom's house to see Deanna because Deanna was staying with Bloom. After no one answered the front door, Brenda went around to the back of the

house and saw Bloom sitting on his porch. Bloom told Brenda that he had not seen Deanna and that she was with some guy named "Chuckie." Bloom then asked Brenda how long Deanna had been seeing Chuckie. Brenda told Bloom that all she knew was that Deanna and Chuckie had gone to school together. Bloom told Brenda that Brenda had better not be lying to him and said, "Don't you know if you are lying to me I will jump off this porch and take my toes and—take my toes around your neck and choke you to death."

In order to preserve an issue for appeal, a party must make a timely and specific objection to the admission of the evidence. See *State v. Sims*, 265 Kan. 166, 174, 960 P.2d 1271 (1998); *State v. Holbrook*, 261 Kan. 635, 643, 932 P.2d 958 (1997); see also K.S.A. 60-404. The State points out that Bloom's objection to this testimony at trial and during the hearing on the motion in limine was that it violated K.S.A. 60-455, which restricts the admission of other crimes and civil wrongs into evidence. It was not until the motion for new trial that Bloom asserted as additional grounds for exclusion of the evidence, relevancy of the evidence and K.S.A. 60-447, which limits the use of a character trait as proof of conduct.

Relevant evidence is evidence having *any* tendency in reason to prove a material fact. K.S.A. 60-401. The determination of relevancy is a matter of logic and experience, not a matter of law. *Simon v. Simon*, 260 Kan. 731, 741, 924 P.2d 1255 (1996). Except as otherwise provided by statute, all relevant evidence is admissible. K.S.A. 60-407(f).

Bloom argues that any threat made to Brenda was irrelevant to the issue in this case. Bloom claims the prosecutor's real motive for introducing the evidence was to show Bloom's propensity for violence and claims that the threat was not necessary to show Deanna's relationship with Bloom. We disagree. Included within the threat was evidence of the relationship between Bloom and Deanna and Bloom's feelings of jealousy. Jealousy is a current state of emotion. Evidence of a current state of emotion is not prohibited by K.S.A. 60-447. The evidence was also not prohibited by K.S.A. 60-455 because there was no crime or civil wrong. The testimony was relevant.

## RIGHT TO CONFRONT WITNESSES

On direct examination, Brenda admitted a 1977 conviction for unemployment fraud. On cross-examination, the defense asked Brenda whether she had been charged with 26 counts of fraud in that case. The prosecutor objected, claiming that once a witness admits he or she has a conviction no further inquiry as to additional charges in the complaint is allowed. The trial judge upheld the prosecutor's objection and prohibited inquiry into the 26 counts of fraud, but allowed Bloom's attorney to question Brenda regarding the details of her conviction. Bloom alleges that prohibiting his questioning of Brenda on all 26 counts of fraud denied him due process and the right to a fair trial and that his constitutional right to confront witnesses was denied.

Evidence of the conviction of a witness for a crime involving dishonesty or false statement is admissible to impair that witness' credibility. K.S.A. 60-421. Obviously, Brenda's conviction for unemployment fraud was admissible under K.S.A. 60-421 to impair her credibility. See *State v. Marble,* 21 Kan. App. 2d 509, 516, 901 P.2d 521 (1995).

Bloom asserts that the trial court unfairly limited his impeachment of Brenda by prohibiting him from questioning her regarding the 26 counts alleged on the complaint, and cites K.S.A. 60-421. This argument is without merit. Under K.S.A. 60-421, only *convictions* involving crimes of dishonesty are admissible to impeach a witness' credibility. See *State v. Johnson,* 219 Kan. 847, Syl. ¶ 4, 549 P.2d 1370 (1976). Thus, because Brenda was not convicted on all 26 counts, the counts not pled to could not be used for impeachment under K.S.A. 60-421.

## USE OF PHOTOGRAPH

Bloom contends he was denied his right to due process and a fair trial when the trial court allowed the prosecutor to exhibit to the jury a previously admitted photo of the crime scene during cross-examination of the defendant.

The photo was shown to the jury after the prosecutor had questioned Bloom about his admission that he had placed the knife back in Deanna's hand and his testimony that he did not know that

Deanna was dead at that time. Bloom had testified that when he placed the knife back into Deanna's hand, her hand was not near her head. The prosecutor then showed Bloom a photo taken by police that showed the victim lying on the floor in a pool of blood, holding a knife in her right hand with the blade pointing toward her. This photo had been admitted into evidence on the first day of trial, 2 days earlier, but had not previously been shown to the jury. The prosecutor asked Bloom:

"Q.: [Prosecutor]: Would you agree that State's Exhibit Number 69 is a picture of Deanna Porter after she is dead?
"A.: [Bloom]: Evidently, yes, ma'am.
"Q.: Would you agree that picture State's Exhibit 69 shows Deanna's hand in close proximity to her head?
"A.: Yes, ma'am.
"Q.: And it shows the hand that you placed the knife in?
"A.: Yes, ma'am, and she moved. The cops said she was moving when he got there.
"Q.: And it is your testimony that you did not know Deanna was dead?
"A.: I did not see any of those injuries."

At that time, the prosecutor requested she be allowed to show the photo to the jury. Defense counsel objected, claiming that the photo had been taken hours after Bloom was last in his house and that under these circumstances it was improper to show Bloom was lying about what he saw before the picture was taken. Out of the hearing of the jury, defense counsel moved for a mistrial, claiming prosecutorial misconduct, alleging that the publishing of the photo at this time was to inflame the jury. The court denied the motion for mistrial, finding that there was no requirement that a photo had to be published at any particular time to be proper and that defense counsel could address his concerns through cross-examination. Defense counsel did not address this issue later.

The admission of photographic evidence, as well as the manner in which the photographic evidence is displayed to the jury, rests within the trial court's sound discretion. *State v. Deavers*, 252 Kan. 149, 162, 843 P.2d 695 (1992), *cert. denied* 508 U.S. 978 (1993). At his motion for new trial, Bloom alleged that publishing the photo at this point in time was to prejudice the jury. The trial court denied a new trial, finding that Bloom was not prejudiced. Bloom claims

the photo was improperly used impeach his testimony as to where the victim's hand was when he placed the knife back in her hand and that the photo did not depict what he saw immediately after the shooting. The trial court did not abuse its discretion in allowing the photo to be viewed by the jury during Bloom's cross-examination.

## USE OF A PLAIN-CLOTHES SECURITY GUARD

Bloom contends he was deprived of his rights to due process and a fair trial when the presence of a security guard prejudiced the jury into believing he was in custody and prone to violence. Bloom contends that upon Bloom being called to testify, a security guard sat next to him until defense counsel approached the bench and the trial judge instructed the security guard to move behind the bench and away from the jury's view.

Central to the right to a fair trial, guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution, is the principle that "one accused of a crime is entitled to have guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial." *Taylor v. Kentucky*, 436 U.S. 478, 485, 56 L. Ed. 2d 468, 98 S. Ct. 1930 (1978). Whenever a courtroom arrangement is challenged as being inherently prejudicial to a criminal defendant, the question is not whether jurors actually articulate a consciousness of some prejudicial effect, but rather whether there exists an unacceptable risk of impermissible factors influencing the jury. *State v. Davidson*, 264 Kan. 44, 51, 954 P.2d 702 (1998).

The record of trial contained no mention of this incident. The issue was first raised in Bloom's motion for new trial. In denying Bloom's motion for new trial on this ground, the trial judge noted that at all times the defendant and the security guards were in suits and that there was nothing to indicate Bloom was in custody. The judge noted that Bloom was never handcuffed in the presence of jurors, nor was he, to the judge's knowledge, ever escorted in the presence of the jurors. The judge noted that the security guard was moved several feet away from Bloom when this was brought to the

court's attention. The judge commended the Department of Corrections for doing such a good job and found that Bloom's due process rights were not violated.

Bloom did not object to the presence of the security guard, and the record does not contain any discussion of the matter. A defendant bears the burden of furnishing a record that affirmatively shows prejudicial error occurred. Absent such a record, an appellate court presumes the action of the trial court was proper. *State v. Moncla*, 262 Kan. 58, 68, 936 P.2d 727 (1997). Assertions in appellate briefs are not sufficient to satisfy inadequacies in the record on appeal. *Hill v. Farm Bureau Mut. Ins. Co.*, 263 Kan. 703, 706, 952 P.2d 1286 (1998). Thus, this issue was not preserved for appeal.

## DENIAL OF DUE PROCESS AND SPEEDY TRIAL

Bloom contends his constitutional and statutory rights to due process and speedy trial were violated. Specifically, Bloom alleges the violation arises as the result of the procedures under the local court rules.

K.S.A. 22-3402(1) states:

"If any person charged with a crime and held in jail solely by reason thereof shall not be brought to trial within ninety (90) days after such person's arraignment on the charge, such person shall be entitled to be discharged from further liability to be tried for the crime charged, unless the delay shall happen as a result of the application or fault of the defendant . . . ."

In this case, Bloom was arraigned on December 16, 1998. On March 8, 1999, less that 90 days later, Bloom appeared before the district court on a joint motion for continuance. The district court judge noted that Bloom was still in jail at that time, and that he was entitled to be brought to trial within 90 days. The judge inquired as to whether Bloom would waive his right to speedy trial and allow trial to be set "down the road aways." Bloom agreed to waive his right to speedy trial. The reason for the continuance was that Bloom's previous counsel had left the public defender's office and Bloom's new counsel needed additional time to prepare for trial. Pursuant to the request, trial was reset for May 24, 1999.

On May 24, 1999, Bloom appeared before the district court on defense counsel's motion for continuance. Bloom stated to the court that he was unhappy with his court-appointed counsel. Bloom indicated he was not requesting counsel be removed, but that he (Bloom) was "just trying to put a fire under her tail." The judge stated:

"THE COURT: And I think that you and all of us want to give Ms. Donovan time to prepare for the trial, your trial, so that she can be in a position to defend you fully, if that's your decision."
"DEFENDANT BLOOM: Yes, ma'am."

Trial was reset for June 21, 1999.

On June 9, 1999, defense counsel once again filed a motion for continuance. The motion and order for continuance noted that the continuance had been requested because the defendant had recently added a new attorney, discovery was not yet completed, and the coroner would be on vacation until mid-August. The motion and order for continuance noted that Bloom had previously waived speedy trial rights. Trial was rescheduled for August 23, 1999.

On July 15, 1999, Bloom filed a pro se motion for new counsel. On July 19, 1999, Bloom's new counsel filed a motion for continuance. On August 13, 1999, Bloom's counsel filed a motion to stay the criminal proceedings and a motion to dismiss, alleging Bloom's statutory right to speedy trial had been violated. Bloom was denied habeas corpus relief after an August 16, 1999 hearing. The district court held that all continuances up until that time were at the request of the defense and that there were no grounds for granting relief. The district court subsequently denied Bloom's motion to dismiss his criminal charge on August 23, 1999. The judge then granted the defendant's request for an another continuance and rescheduled trial for November 8, 1999. Defense counsel noted at that time that they were waiving speedy trial rights "from here on." Additional continuances were also granted at the request of the defense on October 28, 1999, January 7, 2000, and February 24, 2000. Bloom is not appealing these further delays.

At the hearing on the motion to dismiss and on appeal, Bloom refers to a local district court rule that requires a motion for con-

tinuance to contain a signed written waiver of speedy trial rights. Thus, Bloom maintains that his failure to waive speedy trial rights in writing, as required by the local court rules, deprives him of due process of law and a fair trial. Both parties fail, however, to provide the text of this rule on appeal. It appears that the rule Bloom is referring to is Shawnee County District Court Rule 3.319, which requires any party requesting a continuance to complete a "Request for Continuance" form. If requesting continuance of a trial setting, the form requires the defendant's written waiver of speedy trial rights. DCR 3.319.

Bloom claims his March 8, 1999, waiver of speedy trial rights was not an indefinite waiver, and that the continuances granted on May 24, 1999, and June 9, 1999, were in violation of his rights to speedy trial and due process. The June 9, 1999, motion and order for continuance merely noted that Bloom had already waived his right to speedy trial. The record on appeal does not appear to contain a written motion and order for the May 24, 1999, continuance. Thus, neither of these continuances contained a signed waiver of speedy trial rights. It must also be noted that the March 8, 1999, waiver of speedy trial rights, which Bloom does not contest, also fails to contain a written waiver of his speedy trial rights.

District courts are authorized to make rules that are necessary for the administration of affairs of the district court, as long as they do not conflict with the Supreme Court's rules and regulations. Rule 105 (2001 Kan. S. Ct. R. Annot. 152). This does not necessarily mean, however, that the failure to follow these rules would result in a violation of a defendant's due process rights. In order to establish a procedural due process violation, a claimant must establish that he or she was denied a specific procedural protection to which he or she was entitled. In reviewing the claim, the court must determine whether there is a protected liberty or property interest involved, and must then determine the nature and extent of the process due. *State v. Wilkinson*, 269 Kan. 603, 608-09, 9 P.3d 1 (2000). A local court rule requiring a written waiver of a defendant's right to speedy trial does not create a liberty or property interest.

Bloom also claims his statutory rights to speedy trial were violated. A defendant may waive the statutory right to speedy trial by requesting or acquiescing in the grant of a continuance. In calculating speedy trial violations, defense counsel's actions are attributable to the defendant. *State v. Southard*, 261 Kan. 744, 748, 933 P.2d 730 (1997); *State v. Bafford*, 255 Kan. 888, 892, 879 P.2d 613 (1994).

Here, Bloom personally acquiesced to the continuance granted on May 24, 1999, thus it cannot be said this continuance violated his right to a speedy trial. Although there is no indication Bloom affirmatively consented to the continuance granted on June 9, 1999, the continuance was appropriately charged to Bloom because his counsel requested it. See *Bafford*, 255 Kan. at 893 (defendant's claim that he did not acquiesce to his defense counsel's request for a continuance did not prohibit this time from being charged to the defendant in calculating speedy trial; counsel need not obtain defendant's permission prior to moving for a continuance).

Additionally, it must be noted that, contrary to Bloom's contentions, Bloom's waiver of speedy trial on March 8, 1999, was not limited in any manner. Thus, the initial waiver, which Bloom does not contend was invalid, continued, and no additional waiver was required. See *State v. Smallwood*, 264 Kan. 69, 74, 955 P.2d 1209 (1998) (defendant's assertion that waiver of speedy trial was limited to 180-day period failed because the record established the waiver was unconditional). Bloom did not limit his waiver; for Bloom to subsequently allege a speedy trial rights violation, Bloom was required to revoke his waiver.

Bloom also contends his constitutional right to a speedy trial was violated, although neither party briefed the issue. In *State v. Otero*, 210 Kan. 530, 533-34, 502 P.2d 763 (1972), this court adopted the nonexclusive four-factor case-by-case approach set forth in *Barker v. Wingo*, 407 U.S. 514, 530, 33 L. Ed. 2d 101, 92 S. Ct. 2182 (1972), for determining whether a defendant's constitutional right to speedy trial has been violated. *Smallwood*, 264 Kan. at 75. "The factors are: length of delay, reason for the delay, the defendant's assertion of his or her right, and prejudice to the defendant." 264 Kan. at 75. If the length of the delay is not presumptively preju-

dicial, the court need not consider the other factors of the test. *Barker*, 407 U.S. at 530; *Smallwood*, 264 Kan. at 75; *State v. Goss*, 245 Kan. 189, 193, 777 P.2d 781 (1989). "Three factors which may demonstrate the defendant has been prejudiced by a delay of trial are oppressive pretrial incarceration; anxiety and concern of the accused; and, most important, impairment of the defense. *State v. Vaughn*, 254 Kan. 191, 196, 865 P.2d 207 (1993)." *Smallwood*, 264 Kan. at 76.

Bloom was arraigned on December 16, 1998. The jury trial began on June 26, 2000. The total time between arraignment and trial was a little over 18 months. During that time, Bloom only contends that he did not agree to the delay that occurred between May 24, 1999, and July 19, 1999, a period of less than 2 months. Bloom has failed to demonstrate any prejudice that occurred as a result of the delay. Thus, there was no violation of Bloom's constitutional right to a speedy trial.

## ENDORSE AN ADDITIONAL WITNESS

Bloom contends that the trial court erred in endorsing and allowing Michael VanStratton to testify in place of Mary Koch and in allowing the State to violate the pretrial order setting a deadline for the filing of motions.

The prosecution is required to endorse the names of all known witnesses upon the complaint, information, and indictment at the time of filing and may be permitted to endorse additional witnesses at the time prescribed by court rule or otherwise. K.S.A. 2001 Supp. 22-3201(g). K.S.A. 2001 Supp. 22-3201(g) has been construed as conferring broad discretionary power upon the trial court to allow late endorsement of witnesses. *State v. Green*, 252 Kan. 548, 553, 847 P.2d 1208 (1993) (formerly K.S.A. 22-3201[6]). With regard to the late endorsement of State's witnesses, the question is whether the defendant's rights have been prejudiced. *State v. Coleman*, 253 Kan. 335, 349, 856 P.2d 121 (1993). Factors in making this determination include whether the defendant was surprised and whether the testimony was critical. 253 Kan. at 349 (citing *State v. Bright*, 229 Kan. 184, 192, 623 P.2d 917 [1981]). Absent abuse of discretion, endorsement of additional witnesses

will not serve as basis for reversal. *Green*, 252 Kan. at 554; *State v. Costa*, 228 Kan. 308, 315, 613 P.2d 1359 (1980).

On June 20, 1999, 6 days prior to trial, the State requested a continuance because a key witness, Mary Koch, would be out of state at the time. The motion was denied. The following day, the State filed a motion to endorse VanStratton as an additional witness. At the pretrial conference on June 14, 2000, the district judge had set June 19, 2000, as the deadline for filing additional motions. Just prior to trial, Bloom requested the trial court deny the State's late motion to endorse VanStratton. The prosecutor asserted that VanStratton was for all essential purposes a substitute witness and that he would testify to essentially the same thing as Koch would have testified. Bloom objected to the substitution of witnesses, contending that he had spent time preparing for Koch's testimony by looking into prior cases in which she had testified, that VanStratton did not prepare the blood spatter analysis report, and that under these circumstances he would suffer prejudice. The prosecutor informed the court that VanStratton had participated in preparing the report and had reviewed the final report. The court allowed the State to endorse the witness and reserved final ruling on his ability to testify.

When called to testify, VanStratton testified that he personally reviewed items in the case, that he had participated in preparing the blood spatter analysis report with Mary Koch, the author of the report, and that he had "signed off" on the report. At this point defense counsel was permitted to voir dire the witness. During voir dire, VanStratton indicated that some of report was his and some was Koch's. After voir dire, defense counsel noted his previous objection. The trial court allowed VanStratton to testify to the specific conclusions that were reached based upon the blood spatter. After hearing VanStratton's testimony, the trial court admitted the blood spatter analysis report over defense counsel's objection.

The trial court has the authority to modify a pretrial order if necessary to prevent manifest injustice. *Coleman*, 253 Kan. at 347. In this case, there is no evidence the State exercised bad faith in moving to endorse VanStratton just a few days before trial. In fact, the State had first asked for a continuance after discovering Koch

would be unavailable. Koch was a key witness for the State because her testimony would be that the shooter's position was in the living room and that the victim was neither sitting nor standing in a full upright position at the time she was shot. This testimony contradicted what Bloom had stated during his police interview.

The purpose of the endorsement requirement is to prevent surprise to the defendant and provide the defendant an opportunity to interview and examine the witnesses in advance of trial. *Green,* 252 Kan. at 553. In this case there is no evidence of prejudice suffered by Bloom as a result of the late endorsement. Bloom had 4 or 5 days prior to trial in which either to request a continuance or interview and examine the witness the State sought to endorse. We find no unfair surprise or prejudice in allowing the State to endorse this witness.

Affirmed.