No. 87,000

STATE OF KANSAS, *Appellee*, v. STEVEN L. PAPEN, *Appellant*.
(50 P.3d 37)

Opinion filed July 12, 2002.

*Randall L. Hodgkinson*, deputy appellate defender, argued the cause, and *Craig Durham*, assistant appellate defender, was with him on the brief for appellant.

*Debra S. Peterson*, assistant district attorney, argued the cause, and *Nola Foulston*, district attorney, and *Carla J. Stovall*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Steven Papen was convicted by a jury of premeditated first-degree murder of Dana Anderson. A hard 50 sentence was imposed. He appeals his conviction and sentence.

On appeal, Papen argues that: (1) the trial court abused its discretion in excluding the testimony of Papen's expert psychological witness and in responding to the jury's request regarding the testimony of a witness; (2) the especially heinous, atrocious, or cruel aggravating circumstance was unconstitutionally vague; (3) there was insufficient evidence to support the trial court's determination that the murder was especially heinous, atrocious, or cruel; and (4) *State v. Conley*, 270 Kan. 18, 11 P.3d 1147 (2000), which held that *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), did not affect hard 40 sentencing, should be overruled.

The victim, Dana Anderson, was a secretary in the respiratory care unit at Wesley Medical Center in Wichita. Cody Anderson, Dana's 12-year-old son, left Wichita the last weekend in July 2000 to visit relatives in Missouri and Arkansas. He was scheduled to return on Friday, August 11, 2000. Steve Papen was a mechanic for Case Corporation. On August 10, he was on unpaid leave during the company's annual 3-week shutdown.

Dana, Cody, and Papen shared a two-bedroom house, which Papen was buying. They lived together, at Papen's suggestion. Dana and Papen shared a bed, but did not have a conjugal relationship. Although they had never married, Papen considered Dana to be his wife. Papen testified that he and Dana had signed common-law marriage papers so that Dana and Cody could be covered by Papen's insurance.

Dana and Papen met in September 1994, when he was 31 and she was 23. Dana suffered from rheumatoid arthritis, she was unable to bend or twist, and she had already had one hip replacement. They engaged in sexual intercourse one time in December 1994. It caused Dana pain. Papen testified that he then realized that it would not be a relationship with "a lot of sex." He loved her, and decided "not to make an issue out of sex."

On August 10, 2000, Dana left work at approximately 3:30 p.m. The drive from the hospital to their house took approximately 13 minutes. Papen told police that he killed Dana in their bedroom right after she got home. He thought she arrived home at approximately 4:30 and that he killed her between 4:30 and 5.

Papen gave a statement to police in September 2000. He said that he went into the bedroom, where Dana was getting undressed, and she got mad at him for being in the room while she was changing. He lost his temper, picked up a bat, and hit her. Papen said, "I don't think I could stop hitting her." He said that Dana kept baseball bats and canes by the bed, rather than a gun, for defense. He picked up a bat and swung as hard as he could. He didn't really know how many times he hit her with the bat, but he estimated 2 to 4 times. Later, he choked her with his hands. Papen said she probably was unconscious and that "[i]t was more like I was just taking my frustrations out on her." With regard to his wrapping Dana's face in plastic wrap, Papen seemed to say that he wanted to be sure she was not breathing because he did not want her to be suffering. He also told police that while he was cleaning up, he knew he had killed Dana.

Papen told police that he did not remember what made him "pop." At first, Papen said that he and Dana had discussed "fooling around" after she got home from work, a "discussion that went on about everyday," but she said no. Later, he told police that he did not bring up sex that afternoon. He said that he asked her about her day and why she had taken so long to get home.

Papen said that he was "pretty upset" about their home life. He said that his feelings had been building. He told police that Dana had met a new friend at work. He was about Papen's age, a good Christian, who treated her well. He e-mailed Dana constantly. Papen said he got very jealous over that. He believed that Dana was spending time after work with her new friend, but she denied it. He complained that when Dana did come home, her idea of a good time was being "out spending my money." Papen told police, "I don't think I let myself realize it though I mean I just, it just build, build, build." He denied thinking about killing Dana, but he admitted that he "thought about just whacking the shit out of her, I mean, back-handing her."

Papen told police that what caused him to kill Dana was "an accumulation of everything and that night I was gonna insist we had some type of relations." He did not get to that point. He said, "I was just in the same room with her and it's like you know 'get

the hell out of here I'm trying to dress' and shit like that and it, and it just turned into me having to defend my own person." Papen clarified that what he was doing was defending his honor because Dana "had a way of just making me feel like a big f———-g turd."

At trial, Papen told a different story. He said that as Dana began to undress, he put his arm around her, she fell back into his arms and expressed a need for physical intimacy. Papen testified that he fondled her breasts and used a vibrator, which she did not respond to. She asked for a cucumber instead. He went to the kitchen, selected a cucumber, and peeled it. By the time he returned to the bedroom, Dana was getting dressed. She said she was done and told him to do the dishes. Papen testified that he threw the cucumber and then he "lost it." He picked up a bat and hit Dana on the side of her head. He testified that Dana fought back fiercely and called him names. Papen testified that he pushed her down on the bed. "And I couldn't stop myself. I was pissed." He was yelling at her, telling her everything he was mad at her about. He had his hands around her throat, and then she lay still. Police did not find a cucumber in the bedroom.

After killing Dana, Papen tried to put her into a duffle bag, but she did not fit. He threw a sleeping bag over her and closed the bedroom door. After cleaning himself up and changing clothes, Papen went next door and told the neighbor that they would be out of town. He was "trying to divert any suspicions."

Later, he put a pillowcase over Dana's head because he did not want to look at her. He tried to tape the pillowcase around her neck, but the tape did not stick. Papen testified that he had to cover her face because he was "freaked out." He wrapped her head in pink plastic wrap, put her in the sleeping bag, and took her out the back door.

Near midnight, he put the sleeping bag in the trunk of Dana's car and began to drive to Colorado. Papen left Dana's car, with her body in the trunk, at the airport in Colorado Springs. He flew to Las Vegas, took a taxi to a casino, won some money, and got a motel room for Friday night, August 11. On August 12, he flew from Las Vegas to Seattle. He took a taxi to the waterfront, rode ferries, and slept outside Saturday night. On Sunday, August 13,

he went to Discovery Park and took two bottles of Dana's prescription medicine.

Papen regained consciousness in a Seattle hospital on September 6. By September 18, it was determined that Papen was completely cognizant and that his memory was complete. Wichita police were contacted, and on September 19 an officer flew to Seattle to interview Papen.

Cody had arrived home from visiting his relatives at approximately 4:30 on Friday, August 11. Cody and the relatives who brought him home were surprised that Dana, who had been expecting them, was not there. They called police at approximately 5:45. Wichita police talked to Dana's father, who said he was worried because there had been previous domestic strife between Dana and Papen. Although there were signs that someone had made an effort to clean up, police found bloodspatters and blood-pooling in the bedroom and bloodstains on the deck and driveway.

Papen's truck was found at the Wichita airport on Saturday, August 12. The date and time on the airport parking ticket in the truck were August 10, 9:54 p.m. Papen testified that he drove his truck to the Wichita airport and took a taxi home to try to create a "diversion." The truck contained, among other things, an aluminum bat, a spray bottle of Clorox Clean-Up, and a dark green duffle bag. There was blood on the bat and bag.

Dana's car was found at the Colorado Springs airport on August 17. There was quite a bit of camping equipment in the car, a cooler, two bags of clothing, a hair trimmer, and a blond hair coloring kit. Papen testified that he took the camping gear because he thought he might be out in the wilderness hiding from the police. The hair coloring and trimmers were to aid him in disguising himself. In the sleeping bag in the trunk, Dana's naked body was in an advanced state of decomposition. There were several layers of pink plastic wrap wrapped around her head and several layers of duct tape going around the base of the plastic wrap.

An autopsy showed "rather deep" bruises on her left forearm, which could have been defensive injuries, and other severe bruises on her left calf, shin, and ankle. There was hemorrhaging on the right side of the head, above the ear, and a "great deal of hemor-

rhage within the soft tissue on the right cheek." The hemorrhaging on her head was consistent with being hit by a blunt object. In addition, there was quite a bit of hemorrhaging on her left collarbone, in the muscles around her voice box, and directly over the hyoid bone, and her hyoid bone was broken. The pathologist testified that with the exception of severe traffic accidents, hyoid bones only get broken when the person is strangled, either by hands or ligature.

The pathologist was not able to pinpoint the cause of death. She attributed death to "suffocation associated with strangulation and blunt force trauma of the head." She said that the blunt force may have caused Dana to lose consciousness but probably was not enough to kill her. Although strangulation had the potential to kill, it may or may not have done so. Suffocation also had the potential to kill right away and definitely would have killed eventually.

Papen denied that he ever planned to kill Dana. The State presented evidence tending to support its theory that Papen had thought beforehand about killing Anderson. Two of Dana's friends reported troubling conversations with Dana in the weeks before her death. Brenda Whitson testified that on August 1 Dana told her that she was afraid to stay with Papen by herself. Vicki Baca cut Dana's, Cody's, and Papen's hair on July 24 before Cody left for Missouri and Arkansas. Papen told Baca that it aggravated him that Dana and Cody always went to Arkansas when he was working and that it would really upset him if she waited until after he returned to work from the 3-week shutdown to go to Arkansas. Baca testified that Papen said, "[I]f she does wait till after he returns to work August 14th, he's liable to beat her to death with a ball bat." Baca told police that Papen threatened to beat Dana with a bat, but not to beat her "to death" with a bat.

In the weeks before he killed Dana, Papen engaged in some conduct that differed from his conduct during the same period of the preceding year. He failed to return to work after lunch on July 21, the last day before the 3-week shutdown. Papen testified that at lunchtime he went to a liquor store, bought a 40-ounce beer, and drank half of it. He did not go back to work after drinking because that would be grounds for firing him. As soon as his last

Case paycheck had been automatically deposited, Papen withdrew nearly all of it in cash. Then on July 28, there was a $400 deposit into Papen's account and an immediate cash withdrawal of $300. In July and August 1999, there had been no large cash withdrawals from Papen's account. Papen testified that he withdrew the money in 2000 in order to keep from spending it. In his statement to police, Papen said he withdrew the money to keep from spending his money on Dana. He and Dana kept separate bank accounts, but the PIN for his debit card was her birthday and she had used the card.

Papen estimated the time he killed Dana as between 4:30 and 5 on August 10, and he said that he went to the neighbors' house after he killed Dana. The neighbor, Clarence Mai, testified that he ran one errand at about 2 and returned home at approximately 3 or 3:30. When he returned from that errand, his wife told him that he had just missed Papen. Thus, according to Mai, Papen's visit occurred before 3:30.

Papen purchased pink plastic wrap on August 8. He purchased duct tape on August 5. He purchased Clorox Clean-Up on August 9, along with a large quantity of groceries. Papen told police that he "didn't go out and buy a bunch of stuff . . . to do away with Dana." He testified that he bought the duct tape for their above-ground swimming pool. He did not remember buying the plastic wrap, but said that they used containers and plastic wrap for left-overs. Papen testified that the groceries were for the weekend when Cody would return with relatives, but after killing Dana he packed the groceries in his cooler to take with him. There was evidence that Papen used the Clorox Clean-Up to clean after he killed Dana. There also was evidence that the woman who cleaned house every other week for Papen and Dana routinely used Clorox Clean-Up, that when she cleaned on August 9 there was not any, and that Dana had assured her she would put it on the grocery list.

We first consider whether the trial court abused its discretion in excluding the testimony of Papen's expert psychological witness. After reviewing the report and interview of the proposed defense witness, Dr. Robert Schulman, the State filed a motion in limine requesting the trial court to exclude any evidence from him. The

grounds for the motion were that "the proposed testimony of Dr. Schulman is not evidence of a mental disorder or defect, and is therefore not relevant pursuant to K.S.A. 22-3219 or K.S.A. 60-407(f). The expert opinion of Dr. Schulman would not assist the trier [of] fact in interpreting technical facts or in understanding material evidence . . . ." The trial court granted the State's motion in limine.

A proffer of testimony that Schulman would have given if he had testified during Papen's trial is in the record. Based on his psychological evaluation of Papen, Schulman stated:

"Dana Anderson and the defendant had been involved in a long tortuous relationship that had lasted nearly 6 years. They were involved in an approach-avoidance relationship. They could not fully consummate the relationship nor could they separate and seek other relationships. When they did try and separate they were drawn back together and when they were together it was as if a wedge were between them. The defendant believed that if he were patient ultimately the relationship could be consummated psychologically and physically and they would be able to remain together. It was that hope and desire that kept him in the relationship and there were positive aspects of the relationship that led him to believe that it would be successful. At the same time he was very frustrated with her not being more available to him physically and psychologically and he is able to describe how she taunted him with the idea of her being available to him. Although neither of them realized it or would have characterized their relationship as being a death struggle, it in fact was.

"The defendant's hope was to succeed in the relationship and he could not conceive of not being in the relationship with her. Because of the nature of the relationship, he could not have planned and in a deliberate or premeditated way cause her death. What happened at the time of her death was spontaneous, in part precipitated by the victim and done in the heat of passion with diminished capacity.

". . . Neither of these individuals would have harmed the other in a premeditated way and yet each could not live with or without the other one.

"The defendant is not a psychologically ill man, but he is a man who was caught in a desperate struggle with the woman he loved."

The trial court found "as a matter of law that Dr. Schulman's testimony cannot be presented to the jury on the issue of heat of passion or voluntary manslaughter. Those matters [are] for the jury to determine based on ordinary evidence and it doesn't require an expert opinion."

The trial court has broad discretion in admitting or excluding the testimony of an expert witness. Necessity arising out of the particular circumstances of the case is the basis for the admission of expert testimony. To be admissible, expert testimony must be helpful to the jury. Where it is not helpful, that is, where the normal experience and qualifications of laypersons serving as jurors permit them to draw proper conclusions from given facts and circumstances, expert testimony is inadmissible. *State v. Smallwood*, 264 Kan. 69, 80, 955 P.2d 1209 (1998).

In the present case, the trial court determined that the normal experience and qualifications of the laypersons serving as jurors would permit them to draw proper conclusions from the evidence. Accordingly, the trial court ruled that Schulman's testimony would not be admitted.

The trial court's ruling was sound. Schulman's proffer stated that for 6 years Papen and Dana had been in a psychologically and physically unfulfilled relationship. Papen testified that he and Dana met in 1994. They bought a house together, but Papen complained of bearing the financial burden. Even though they slept in the same bed, there was no physical intimacy between them. Papen said that Dana was very cold to him, and he suspected her of forming relationships with other men. From Papen's testimony, the jurors could have concluded for themselves that the relationship was psychologically and physically unfulfilling for Papen, and there was no need for expert psychological testimony.

Schulman offered the opinion that "[b]ecause of the nature of the relationship, [Papen] could not have planned and in a deliberate or premeditated way cause[d] her death." Furthermore, Schulman opined that "[w]hat happened at the time of her death was spontaneous, in part precipitated by the victim and done in the heat of passion with diminished capacity." In other words, Schulman would have testified that Papen did not have the mental capacity to plan to kill Dana.

Although Papen filed a notice pursuant to K.S.A. 22-3220, he did so out of an abundance of caution. In response to the State's motion in limine, Papen responded that he was not offering the

psychiatric testimony to present a mental disease or defect defense but to support his defense of a lack of premeditation.

In similar circumstances in *State v. Hobson*, 234 Kan. 133, 159-60, 671 P.2d 1365 (1983), the court affirmed the trial court's excluding expert psychiatric testimony about the defendant's mental capacity to arrange a murder. The court found no authority that would support the admission of evidence of a defendant's mental capacity to commit a specific act where insanity was not an issue. The court stated:

"It is well settled that expert opinions are admissible on the issue of sanity or insanity in criminal prosecutions because it is an area where expert opinion is particularly useful and oftentimes necessary to interpret for the jury the manifestations of mental derangement and the significance of symptoms. See *State v. Garcia*, 233 Kan. [589,] 598-99 [, 664 P.2d 1343 (1983)] and authorities cited therein. No case law or other authorities are cited by the appellant which state evidence of a defendant's mental capacity to commit a specific act is admissible where an insanity defense has not been raised and insanity is not an issue. The appellant did not raise an insanity defense in the instant case.

"The ultimate issue of fact to be determined by the jury was whether the appellant did or did not commit the crimes charged. The proffered opinion testimony by Dr. Day, based on his contact with the appellant subsequent to the time when the crime was committed, was that she could not have committed the crime because she lacked the mental capacity to do so. This evidence squarely embraced the issue to be determined by the jury. As stated above expert opinion testimony is permitted only insofar as it 'will aid the jury in the interpretation of technical facts or when it will assist the jury in understanding the material in evidence.' The facts presented by the evidence were neither technical, complicated nor beyond the average experience and common understanding of the jury. In rendering a verdict the jury was required only to weigh the evidence and pass on the credibility of the witnesses. Either they believed the appellant's version of the events or the version presented by the prosecution witnesses. The opinion evidence proffered by the appellant encroached directly upon the jury's exclusive province to determine from the evidence whether or not the appellant actually committed the crime, and therefore was properly excluded by the trial court." 234 Kan. at 160-61.

On this issue, the circumstances of the present case are indistinguishable from those in *Hobson*. We conclude *Hobson* is controlling here.

Prior to oral argument, appellant's counsel filed a notice of additional case authority. That authority was our recent opinion in

*State v. Greene,* 272 Kan. 772, 37 P.3d 633 (2001). Counsel's reliance on *Greene* is misplaced.

The issue in *Greene* was ineffective assistance of counsel. The admission of the psychological expert testimony was not directly at issue. It was a collateral matter bearing on the issue of ineffective assistance of counsel. In *Greene,* as here, mental disease or defect was not relied on as a defense. Greene's counsel requested a jury instruction on diminished capacity based on lack of requisite intent to kill. As we pointed out in *Greene,* "[n]either an insanity defense nor diminished capacity, as described in *Jackson,* are applicable to crimes committed after January 1, 1996." 272 Kan. at 780. *Greene* does not support Papen's argument.

In addition, in this case there is reason to question whether Schulman's opinions are solidly based on facts personally known to him, as required for the admission of expert opinions by K.S.A. 60-456(b)(1). In particular, Schulman's opinion that neither Papen nor Dana "would have harmed the other in a premeditated way and yet each could not live with or without the other one" is suspect. Schulman laments the couple's failure to seek counseling. He had no contact with Papen and Dana as a couple. His contact with Papen occurred after Dana was dead, and Schulman had no contact with Dana. An expert must have a factual basis for his or her opinions in order to separate them from mere speculation.

In the present case, as in *Smallwood,* 264 Kan. 69, appellant contends that the trial court's ruling on the admissibility of expert testimony raises federal constitutional questions. Papen contends that exclusion of Schulman's testimony was a violation of his Sixth Amendment right to compulsory process and a violation of his due process right to refute the premeditation element of the crime charged and to establish the heat of passion element of voluntary manslaughter. The harm Papen posits as a result of the trial court's exclusion of Schulman's testimony is that he was unable to fully explain the technical aspects of his defense to the jury. As already discussed, in the circumstances of this case, there were no technical aspects of the defense that were not comprehensible by the jury.

Papen next contends that the trial court abused its discretion in responding to the jury's request regarding the testimony of a wit-

ness. During deliberations, the jury requested "a copy of the transcript with Mr. Mai's testimony" in order "to verify the time frame of Mr. Mai's errands and the time of Steve Papen's visit." Defense counsel asked that both direct and cross-examination of Clarence Mai be read back to the jury. The trial court ruled that the jurors would "only get what they asked for." The jury returned to the courtroom where the following portion of Mai's testimony was read to the jury:

"Q.   . . . And, on August the 10th, in the afternoon, did you have an occasion to leave your home and [your wife] was there by herself?
"A.   I did.
"Q.   Okay.
"A.   I did.
"Q.   And approximately what time of day was that?
"A.   Well, I run two errands. I run one about 2 o'clock and I come back, oh, approximately 3 or 3:30, and I had to run another errand after that which was —
"Q.   Okay.
"A.   — just about the same length of time.
"Q.   Okay. So then your next errand started at what time?
"A.   Approximately 4 o'clock.
"Q.   Okay. And what time do you think you probably returned?
"A.   Oh, I wasn't gone more than an hour, if that long.
"Q.   Okay. So probably 4 to 5 —
"A.   Uh-huh."

It is obvious that the jurors did not "get what they asked for." They requested Mai's testimony for the times of his errands *and* the time of Papen's visit. Mai testified that after he returned from the first errand his wife told him that he had just missed Papen, who had been there and talked to her. Mai further testified that it was not until he returned home after his second errand that his wife told him what Papen had said. The omission of Mai's testimony about the time of Papen's visit, however, is not what Papen complains about on appeal.

Papen contends that the trial court erred by rejecting defense counsel's request that Mai's cross-examination testimony be included in the read-back. What Papen argues is significant about the cross-examination testimony was Mai's agreeing that he was "guesstimating" those times.

K.S.A. 22-3420(3) provides that "[a]fter the jury has retired for deliberation, if they desire to be informed as to any . . . evidence arising in the case, they may request the officer to conduct them to the court, where . . . the evidence shall be read or exhibited to them . . . ." Applying the statute, the court has stated that the "trial court must accede to a jury's request to read back testimony. The manner of acceding to the request is subject to trial court discretion." *State v. Myers*, 255 Kan. 3, Syl. ¶ 1, 872 P.2d 236 (1994). "The trial court has the discretion to clarify and focus the jury's inquiry when the jury has requested a read-back of testimony." *State v. Miller*, 268 Kan. 517, Syl. ¶ 8, 997 P.2d 90 (2000).

In the present case, the jury wanted Mai's testimony in order to verify when he left home and returned. The direct examination testimony that was read to the jury contained the times when Mai left home and returned.

Papen contends that the jury's request was not satisfied because the read-back did not inform the jury that Mai's testimony about the times of his errands was only an approximation. Papen argues that the jury should have been read Mai's affirmative response to defense counsel's question about "guesstimating" the times. Contrary to Papen's position, the read-back testimony clearly and repeatedly stated that the times were approximations. Mai was asked *approximately* when he went on the first errand, and he responded that he left *about* 2 and returned at *approximately* 3 *or* 3:30. Regarding the second errand, Mai said that he left at *approximately* 4 and that he "wasn't gone more than an hour, if that long." Mai's admission on cross-examination that he was "guesstimating" was nothing more than a slight variation on the testimony that was read back to the jury. The read-back provided by the trial court satisfied the jury request insofar as it involved the times of Mai's errands. There was no abuse of discretion.

Papen next argues that the especially heinous, atrocious, or cruel manner aggravating circumstance is unconstitutionally vague. See K.S.A. 2001 Supp. 21-4636(f). Papen did not challenge the constitutionality of the especially heinous, atrocious, or cruel manner aggravating circumstance in the trial court. He urges this court to review the issue because it fits within the recognized exceptions to

the general rule that constitutional issues raised for the first time on appeal are not properly before this court. See *State v. Mason*, 268 Kan. 37, 39, 986 P.2d 387 (1999). Papen urges this court to consider his newly asserted constitutional theory on the grounds that it is strictly a question of law and consideration is necessary to serve the ends of justice. See *State v. Conley*, 270 Kan. 18, 30-31, 11 P.3d 1147 (2000), *cert. denied* 532 U.S. 932 (2001). Being influenced by the recent filing of *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), this court elected to address Conley's constitutional argument. There is no similar reason why this court should elect to consider Papen's argument.

Moreover, as the State points out, the aspects of the statute complained of by Papen have no application to this case. A defendant to whom a statute may constitutionally be applied cannot challenge the statute on the ground that it may conceivably be applied unconstitutionally in circumstances not before the court. *State v. Neighbors*, 21 Kan. App. 2d 824, 828, 908 P.2d 649 (1995).

Papen objects to those portions of the statute that eliminate any requirement that the victim be aware of his or her fate or have conscious pain and suffering before death. Papen's position, as stated in his brief, is that this "omission has so watered down the purported aggravating circumstance that ordinary persons must guess as to its meaning and differ as to its application." The evidence in the present case showed that Dana was conscious when Papen swung as hard as he could and hit her in the head with a baseball bat. She had deep bruises on her forearms that were consistent with defensive injuries, and Papen testified that she fought back. Papen estimated that he hit her 2 to 4 times with the bat. Then he choked her when she probably, but not certainly, was unconscious.

Papen also objects to subsection (7) of K.S.A. 2001 Supp. 21-4636(f), which provides that "any other conduct in the opinion of the court that is especially heinous, atrocious or cruel" may be considered sufficient to constitute an aggravating circumstance. The trial court in the present case did not rely on subsection (7) in finding that Papen killed Dana Anderson in an especially heinous, atrocious, or cruel manner.

Papen next questions whether the evidence was sufficient to support the trial court's determination that the murder was committed in an especially heinous, atrocious, or cruel manner. The trial court made the following findings in imposing a hard 50 sentence:

"The evidence does show that there was preparation and planning involved in this murder. The evidence does not show that planning and preparation indicated an intention that the killing was meant to be especially heinous, atrocious or cruel.

"There was infliction of mental anguish and physical abuse upon Dana Anderson before she was killed. To a certain extent, she was tortured.

"There were continuous acts of violence which begun—began and—well, there were several acts of violence which either amount to continuing before, to result in the killing or they continued after the killing.

"I'll find as a matter of law that, under the facts of this case, that wrapping a body and placing it in the trunk of a car and leaving it there does not rise to the level of desecration of a body. It cannot, as a matter of law.

"I look at the mitigation of no criminal history and I'm not persuaded by that. I look at the—whether there was extreme mental influence or not, and I'm not persuaded by Dr. Schulman's report.

"I find that the aggravating factors outweigh the mitigating factors, and I will impose a sentence of a . . . Hard-50."

Papen contends that there was insufficient evidence to support the trial court's conclusion that the killing was committed in an especially heinous, atrocious, or cruel manner. Where the sufficiency of the evidence for establishing an aggravating circumstance under K.S.A. 2001 Supp. 21-4636 is challenged, the standard of review is whether, after a review of all the evidence, viewed in the light most favorable to the State, a rational factfinder could have found by a preponderance of the evidence the existence of the aggravating circumstance. See *State v. Spain*, 263 Kan. 708, Syl. ¶ 6, 953 P.2d 1004 (1998).

K.S.A. 2001 Supp. 21-4636 identifies eight aggravating circumstances, including that the defendant committed the crime in an especially heinous, atrocious, or cruel manner. With regard to that aggravating circumstance, the legislature has provided these guidelines:

"A finding that the victim was aware of such victim's fate or had conscious pain and suffering as a result of the physical trauma that resulted in the victim's death is not necessary to find that the manner in which the defendant killed the victim

was especially heinous, atrocious or cruel. In making a determination that the crime was committed in an especially heinous, atrocious or cruel manner, any of the following conduct by the defendant may be considered sufficient:

"(1) Prior stalking of or criminal threats to the victim;

"(2) preparation or planning, indicating an intention that the killing was meant to be especially heinous, atrocious or cruel;

"(3) infliction of mental anguish or physical abuse before the victim's death;

"(4) torture of the victim;

"(5) continuous acts of violence begun before or continuing after the killing;

"(6) desecration of the victim's body in a manner indicating a particular depravity of mind, either during or following the killing; or

"(7) any other conduct in the opinion of the court that is especially heinous, atrocious or cruel." K.S.A. 2001 Supp. 21-4636(f).

The trial court found there was an infliction of mental anguish or physical abuse before the victim's death, torture of the victim, and continuous acts of violence begun before or continuing after the killing. See K.S.A. 2001 Supp. 21-4636(f)(3), (4), and (5).

In the statement he gave to police, Papen said that he hit Dana 2 to 4 times with the baseball bat and that later he choked her. He said that when he choked her, she probably was unconscious. He was taking out his frustrations on her. At trial, Papen testified that he swung the baseball bat and hit Dana on the side of her head. The autopsy showed hemorrhaging consistent with blunt object trauma above her ear, on her cheek, and on her collarbone, and hemorrhaging on her forearm consistent with defending herself against being struck with a blunt object. The autopsy also showed a broken hyoid bone and hemorrhaging in the muscles over her voice box consistent with strangulation. In addition, Dana's face was wrapped with plastic wrap, and there was duct tape at the base of the wrap. The pathologist testified that the blunt force trauma probably did not kill Dana and that her death could have been due either to strangulation or to suffocation.

K.S.A. 2001 Supp. 21-4636(f) provides that any of the conduct identified in its subsections may be considered sufficient to constitute a killing done in an especially heinous, atrocious, or cruel manner. The evidence in this case supports several of the types of conduct identified in the statutory subsections. The evidence suf-

ficiently shows that Papen killed Dana Anderson in an especially heinous, atrocious, or cruel manner.

Finally, Papen asserts that *Conley* was incorrectly decided and should be reconsidered. This court recently declined a request to reconsider its result and rationale in *Conley*. See *State v. Lessley*, 271 Kan. 780, 795, 26 P.3d 620 (2001).

Affirmed.