NOT DESIGNATED FOR PUBLICATION

Nos. 118,037
118,203

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JOSEPH TAYLOR HUGHES,
*Appellant*.

MEMORANDUM OPINION

Appeal from Shawnee District Court; NANCY E. PARRISH, judge. Opinion filed February 1, 2019. Affirmed.

*Peter Maharry*, of Kansas Appellate Defender Office, for appellant.

*Jodi Litfin*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before GARDNER, P.J., HILL and SCHROEDER, JJ.

PER CURIAM: A jury convicted Joseph Taylor Hughes of attempted second-degree murder, two counts of robbery, one count of aggravated burglary, three counts of criminal damage to property, one count of domestic battery, one count of aggravated battery, three counts of conspiracy to obstruct prosecution, and three counts of conspiracy to commit perjury. The district court sentenced Hughes to a 122-month term of imprisonment and 36 months of postrelease supervision. Hughes raises five issues on appeal: (1) the crime of obstructing prosecution is constitutionally overbroad; (2) the State committed prosecutorial error in its closing statement; (3) the district court erred in denying his

1

motion to sever the crimes committed on January 3 and 4, 2015, from those committed on January 18, 2015; (4) the district court erred by consolidating the conspiracy charges with the other incidents; and (5) he is entitled to relief because of cumulative error.

FACTS

The State charged Hughes in 15CR96 for two incidents with Stacey Miner. First, the State charged Hughes for his acts on January 18, 2015. Later, the State amended its complaint and added charges against Hughes for his acts on January 3 and 4, 2015. Hughes moved to sever those charges, but the district court denied Hughes' motion.

Hughes tried to bolster his version of those two incidents by securing favorable false testimony from Justin McNorton, Erin Wilson, and others. As a result, the State charged Hughes in 15CR1836 with three counts of conspiracy to obstruct prosecution and three counts of conspiracy to commit perjury. The State moved to consolidate 15CR1836 with 15CR96, and the district court granted the consolidation over Hughes' objection. At trial, McNorton and Wilson testified against Hughes.

Hughes and Miner also testified, presenting two opposing versions of the events. According to Miner, on the evening of January 3 and morning of January 4, 2015, Hughes dragged her to the ground, straddled her, and banged her head on the ground. He repeatedly threw her to the ground, then held her against his van, and started to choke her. Miner pretended to go unconscious and Hughes dropped her. Miner tried to flee and Hughes dragged her back. He emptied out her purse, threw her down, straddled her, and punched her face. Miner then fled to her mother's home but left behind her phone. Over the next few days, Hughes attempted to contact Miner through her mother. He later returned some of Miner's belongings, including her phone. From then until January 18, 2015, Hughes called or sent text messages to Miner "all day, every day" and, according to Miner, the next two weeks were "just pure chaos."

2

Miner told the jury that on January 18, 2015, she and Hughes had a fight over the phone. Hughes arrived at Miner's home, pounded on her door, pushed her car into the closed garage door with his Jeep, then left. Police arrived, made a report, helped Miner remove her car from the garage door, and left. Afterwards, she went to her garage to smoke, Hughes returned, climbed through her garage door, and took her phone away as she dialed 911. Miner locked herself in her home, fled to the bathroom with her laptop, and locked the door. She used her laptop to send messages through social media to friends and family. Hughes broke into Miner's house, kicked in the bathroom door, and destroyed her laptop. He then dragged her by her ankles, ripped her pants off, raped her, and choked her into unconsciousness. Law enforcement officers testified to finding Miner severely beaten and bloody, with a shoe print on her face.

Hughes testified that on the evening of January 3 and morning of January 4, Miner and Hughes argued and she jumped on his back. Hughes threw her off; Hughes' mother threatened to call police and Miner left.

According to Hughes, early in the morning on January 18, he saw Miner run into his Jeep with her car at his home. As Miner left his house, Hughes spoke with her by phone and she invited him to her home, so he drove there. Hughes saw Miner's car halfway through her garage door. He parked, argued with Miner, left, and later returned. Hughes saw Miner in her garage, the two accused each other of cheating, and Miner gave her phone to Hughes to look through. Hughes saw the phone dialing 911 and ended the call. He left with Miner's phone and found messages to others explaining she was still with Hughes for his money. He returned to Miner's home to confront her, the two argued, and Miner went inside. Hughes alleges Miner threatened to kill herself, so he kicked in the locked door. Miner locked herself in the bathroom, but Hughes kicked it in because he was worried she would overdose on medication. Miner threw her laptop at Hughes, the two argued again, and Hughes tried to leave. Miner pulled on Hughes, he fell, and accidently kicked Miner. Hughes then left.

3

The jury acquitted Hughes of rape, one count of aggravated burglary, and one count of robbery. The jury convicted Hughes of attempted second-degree murder, two counts of robbery, one count of aggravated burglary, three counts of criminal damage to property, one count of domestic battery, one count of aggravated battery, three counts of conspiracy to obstruct prosecution, and three counts of conspiracy to commit perjury.

ANALYSIS

*K.S.A. 2017 Supp. 21-5913 is not unconstitutionally overbroad.*

Hughes argues for the first time on appeal K.S.A. 2017 Supp. 21-5913 is unconstitutionally overbroad. Generally, constitutional grounds for reversal asserted for the first time on appeal are not properly before the appellate court for review. *State v. Daniel*, 307 Kan. 428, 430, 410 P.3d 877 (2018). Even so, Hughes' challenge is a new theory involving a question of law on proved or admitted facts; thus, we will review his claim. *State v. Phillips*, 299 Kan. 479, 493, 325 P.3d 1095 (2014).

*Hughes has standing.*

The State alleges Hughes lacks standing to challenge K.S.A. 2017 Supp. 21-5913 as overbroad because Hughes' claims are on behalf of the rights of others. The State's argument is not persuasive. Standing is a jurisdictional question in which courts determine whether a party has alleged a sufficient stake in the controversy to warrant invocation of jurisdiction and to justify the exercise of the court's remedial powers on that party's behalf. *Board of Johnson County Comm'rs v. Jordan*, 303 Kan. 844, 854, 370 P.3d 1170 (2016). Generally, a defendant lacks standing to challenge a statute's constitutionality when he or she alleges the statute could be unconstitutionally applied in circumstances not before the court. *State v. Papen*, 274 Kan. 149, 162, 50 P.3d 37 (2002). That said, the defendant has standing to challenge the statute's constitutionality when he or she alleges the statute is overbroad for impermissibly regulating the First Amendment

4

rights of others. See *State v. Neighbors*, 21 Kan. App. 2d 824, 828, 908 P.2d 649 (1995). Hughes has standing because he alleges K.S.A. 2017 Supp. 21-5913 criminalizes the right of a defendant to legal representation and the free speech rights of others advocating for a prisoner's release.

*K.S.A. 2017 Supp. 21-5913 does not criminalize constitutional activity.*

Determining a statute's constitutionality is a question of law subject to unlimited review. Appellate courts presume statutes are constitutional and must resolve all doubts in favor of a statute's validity. Courts must interpret a statute in a way that makes it constitutional if there is any reasonable construction that would maintain the Legislature's apparent intent. *State v. Petersen-Beard*, 304 Kan. 192, 194, 377 P.3d 1127, *cert. denied* 137 S. Ct. 226 (2016).

Hughes' claim also requires statutory interpretation, a question of law over which appellate courts have unlimited review. *State v. Jordan*, 303 Kan. 1017, 1018, 370 P.3d 417 (2016). The most fundamental rule of statutory construction is that the intent of the Legislature governs if that intent can be ascertained. 303 Kan. at 1019. An appellate court must first attempt to ascertain legislative intent through the statutory language enacted, giving common words their ordinary meanings. *State v. Barlow*, 303 Kan. 804, 813, 368 P.3d 331 (2016). When a statute is plain and unambiguous, an appellate court should not speculate about the legislative intent behind that clear language, and it should refrain from reading something into the statute that is not readily found in its words. 303 Kan. at 813.

An overbroad statute punishes constitutionally protected activity. *State v. Whitesell*, 270 Kan. 259, 270-71, 13 P.3d 887 (2000). A defendant's claim that a statute is overbroad will only succeed when the protected activity is a significant part of the law's

5

target and there is no satisfactory method to sever the constitutional portion of the statute from unconstitutional applications. 270 Kan. at 270.

K.S.A. 2017 Supp. 21-5913, in pertinent part, reads:

"(a) Obstructing apprehension or prosecution is knowingly harboring, concealing or aiding any person who:
(1) Has committed or who has been charged with committing a felony or misdemeanor under the laws of this state, other than a violation of K.S.A. 22-4903, and amendments thereto, or another state or the United States with intent that such person shall avoid or escape from arrest, trial, conviction or punishment for such felony or misdemeanor."

Conviction under this statute is a misdemeanor or a felony, depending on the severity of the crime charged or committed by the individual trying to evade punishment. K.S.A. 2017 Supp. 21-5913(b).

Hughes alleges K.S.A. 2017 Supp. 21-5913 criminalizes any aid to a criminal defendant, and defense counsel could be convicted for representing their clients. He also claims an individual exercising his or her free speech rights, for example, to seek the governor's pardon for a prisoner, risks conviction under K.S.A. 2017-Supp. 21-5913.

Although the statute and the Kansas Criminal Code do not define avoid or escape, appellate courts must give these words their ordinary meaning. See *Barlow*, 303 Kan. at 813. Avoid means "to keep away from; evade; shun" and escape means to "get away; get out; break loose, as from prison." Webster's New World College Dictionary 99, 495 (5th ed. 2014). Accordingly, K.S.A. 2017 Supp. 21-5913 could be overbroad if an individual was knowingly harboring, concealing, or aiding any person who committed or who has been charged with committing a felony or misdemeanor and intends the accused "to keep

6

away from; evade; shun" or "get away; get out; break loose" from arrest, trial, conviction or punishment.

Neither of Hughes' arguments are persuasive because a reasonable reading of K.S.A. 2017 Supp. 21-5913 indicates the statute is not overbroad. See *Petersen-Beard*, 304 Kan. at 194. A defense counsel's representation does not keep away from, evade, or shun the accused from an arrest or trial. Indeed, the opposite is true; the defense counsel navigates the accused through the trial process or secures his release from arrest—not to evade either process but by ensuring the accused's constitutional rights are protected and enforced.

Likewise, a third party's request to the governor for a pardon of a prisoner is not an attempt to help the prisoner get away from or get out of a conviction or punishment. A pardon is forgiveness and relieves the accused from the legal consequences of a specific crime. *Parker v. State*, 247 Kan. 214, 218, 795 P.2d 68 (1990) (citing 59 Am. Jur. 2d Pardon and Parole § 1). The third party requesting a pardon for a prisoner is helping the prisoner seek relief from the legal consequences, not evade them. K.S.A. 2017 Supp. 21-5913 does not punish constitutionally protected acts. Hughes' claim K.S.A. 2017 Supp. 21-5913 is unconstitutionally overbroad fails and provides him no relief.

*There is no prosecutorial error.*

A claim of prosecutorial misconduct—now referred to as prosecutorial error—based on comments made during voir dire, opening statements, or closing argument (that are not evidence) will be reviewed on appeal even when a contemporaneous objection was not made at the trial level. *State v. Anderson*, 294 Kan. 450, 461, 276 P.3d 200 (2012); see *State v. McBride*, 307 Kan. 60, 64-65, 405 P.3d 1196 (2017) (statements during closing argument).

Under the modified *Sherman* standard, the appellate court uses a two-step process to evaluate claims of prosecutorial error:

> "These two steps can and should be simply described as error and prejudice. To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.' *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), *cert. denied* 565 U.S. 1221 (2012). We continue to acknowledge that the statutory harmlessness test also applies to prosecutorial error, but when 'analyzing both constitutional and nonconstitutional error, an appellate court need only address the higher standard of constitutional error.' [Citation omitted.]" *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

Courts do not isolate the prosecutor's comments challenged on appeal but review those comments in their context. *State v. Butler*, 307 Kan. 831, 865, 416 P.3d 116 (2018). Even if the prosecutor's actions are egregious, reversal of a criminal conviction is not an appropriate sanction if the actions are determined to satisfy the constitutional harmless test. *Sherman*, 305 Kan. at 114.

Hughes compares the State's closing arguments to those made in *State v. Elnicki*, 279 Kan. 47, 62, 105 P.3d 1222 (2005), and *State v. Lockhart*, 24 Kan. App. 2d 488, 492, 947 P.2d 461 (1997). In *Elnicki*, police arrested Elnicki for rape and criminal sodomy. He gave four differing statements to police and others about the incident. Although he did not testify at trial, the State called Elnicki's credibility into question. In closing

arguments, the prosecutor claimed Elnicki's differing statements were a "yarn," "fairy tale," "fabrication," "tall tale," and "spin." 279 Kan. at 62. The Kansas Supreme Court found the prosecutor's use of these euphemisms was error because it was like telling the jury Elnicki's statements were lies. 279 Kan. at 64.

Similarly, in *Lockhart*, the prosecutor told the jury: "I'll tell you what isn't a rare moment, for defense counsel to lie for the defendant up here." 24 Kan. App. 2d at 491. Defense counsel objected, moved to strike the comment, and moved for a mistrial. The district court sustained the objection but took the motion for mistrial under advisement and allowed the prosecutor to continue. He then told the jury: "The defendant has lied. He said he's not a drug dealer. Defense counsel got up here and told you what the defendant did. Well, he lied, ladies and gentlemen. The defendant lied. He's a drug dealer. That's not a rarity. That's what took place." 24 Kan. App. 2d at 491. The panel there concluded the prosecutor's comments were prosecutorial error because they were "serious breaches" of the wide latitude afforded to a prosecutor during closing arguments. 24 Kan. App. 2d at 492.

This case is unlike *Elnicki* and *Lockhart*. At trial, McNorton testified Hughes asked him to falsely testify for him. According to McNorton, he was asked to testify he witnessed the January 18 incident between Hughes and Miner. Hughes gave McNorton a letter to help him with this story. In it, McNorton witnessed Hughes breaking into Miner's home to try and prevent her suicide attempt. The letter matched Hughes' testimony about the events of January 18. Ultimately, McNorton told the jury he did not witness those events.

Likewise, Wilson testified Hughes asked her to falsely testify on his behalf. According to Wilson, Hughes gave her a letter to memorize and use as her fake testimony. In the letter, Wilson claims Miner told her she lied about the incidents with Hughes. However, Wilson told the jury none of the incidents in the letter were true.

9

The State admitted both letters into evidence. In its closing argument, the State told the jury:

"And you can also look to—ladies and gentleman, I want you to take a look at this evidence. I would ask that you please, out of all the evidence, pull out the letters he provided to . . . McNorton and . . . Wilson. What you will find is [Hughes'] version of the events that day. How he was the hero. How he was there to just make sure things were okay. How he was going in just to save her from herself. How he is the grieving party. How his feelings get hurt so easily. That's in those letters that . . . McNorton was supposed to get up here and testify about. . . . [E]verything was accounted for. Every 'I' is dotted, every 'T' is crossed. Every little weird thing about the evidence, every little weird thing that will make him look good, he spins to make himself look good. He wrote the perjured testimony that he authored and gave to . . . McNorton matches to a 'T' everything he wanted to say.

. . . .

"But you really have two choices right now, right? You have to decide whether [Hughes] was the hero of his own stories, whether he's the good guy just looking out for his family. . . . Or was it the controlling [Hughes], the emotionally manipulative [Hughes], the one who threatened suicide to get [Miner] back?"

In its closing rebuttal, the State told the jury:

"[Hughes] was able to convince that young man to lie on his behalf. And if you want to know where the hero stories come from, if you want to know what [Hughes] thinks of himself in that hero complex that he had, and the hero that he was on the 18th, then you read the script that he gave . . . McNorton."

Hughes alleges the State's "hero complex" comments are akin to mocking him and are like the comments made by prosecutors in *Elnicki* and *Lockhart.* However, the record reflects the term "hero complex" was used only one time during the prosecutor's rebuttal closing argument. The term "hero complex" was not used multiple times and was intermingled in the rebuttal argument and not emphasized. Unlike *Elnicki*, the State did

10

not provide euphemisms akin to calling Hughes a liar. Moreover, the State did not call Hughes a liar like in *Lockhart*. The State's remarks using the term "hero complex" was not the best choice of words. It does contemplate some mental issue was involved with Hughes' action without any medical testimony. But during its closing, the State explained the jury had two choices, believe Hughes' version of the events or Miner's. The State argued Hughes' version made him out to be the hero, a term used four times, which is fair comment on the evidence.

The State then discounted Hughes' version of the events by pointing out his story matched the letters he gave to McNorton and Wilson. McNorton and Wilson testified Hughes wrote those letters to help them provide false and favorable testimony for Hughes. The State's closing argument was within the wide latitude provided prosecutors and was not error. See *Sherman*, 305 Kan. at 114. While we agree the term "hero complex" should not have been used to expand the prior use of "hero," we find the error to be harmless. We are convinced the error was harmless as the one-time use of the term fails in our minds to show the error contributed to the verdict. Thus, we are convinced "there is no reasonable possibility that the error contributed to the verdict." *Sherman*, 378 Kan. at 109.

*The district court did not err in denying Hughes' motion to sever the January 3 and 4, 2015 incidents with January 18, 2015.*

Hughes claims the district court erred when it denied his motion to sever the charges from the January 3, 4, and 18, 2015 incidents. The appellate court reviews potential joinder errors using a three-step analysis, applying a different standard of review at each step. First, the court determines whether K.S.A. 22-3202 permits joinder. Under that statute, multiple complaints against a defendant can be tried together if the State could have brought the charges in a single complaint. K.S.A. 22-3202(1) establishes the three conditions permitting the joining of multiple crimes in a single complaint: (1)

11

the charges must be of the "same or similar character"; (2) the charges are part of the "same act or transaction"; or (3) the charges result from "two or more acts or transactions connected together or constituting parts of a common scheme or plan." Whether one of these conditions is satisfied is a fact-specific inquiry, and the appellate court will review the district court's factual findings for substantial competent evidence and the legal conclusion that one of the conditions is met de novo. *State v. Ritz*, 305 Kan. 956, 961, 389 P.3d 969 (2017); see *State v. Robinson*, 303 Kan. 11, 204, 363 P.3d 875 (2015), *cert. denied* 137 S. Ct. 164 (2016) (defining common scheme or plan).

Second, because K.S.A. 22-3202(1) provides "charges 'may' be joined, a district court retains discretion to deny a joinder request even if a statutory condition is met. We review this decision for an abuse of discretion." *State v. Hurd*, 298 Kan. 555, 561, 316 P.3d 696 (2013).

Finally, if an error occurred in the preceding steps, we determine whether the error resulted in prejudice, i.e., whether the error affected a party's substantial rights. K.S.A. 2017 Supp. 60-261; *Hurd*, 298 Kan. at 561.

Hughes does not claim the district court erred in its factual findings or abused its discretion. An argument not raised is deemed waived and abandoned. See *State v. Arnett*, 307 Kan. 648, 650, 413 P.3d 787 (2018). As such, we decline to address whether substantial competent evidence supports the district court's legal conclusions. See *Ritz*, 305 Kan. at 962-64. Similarly, we do not need to review the second step of the three-step joinder analysis. See *Hurd*, 298 Kan. at 561. That said, Hughes argues the district court erred in its legal conclusion, so this court exercises de novo review over the district court's decision. 305 Kan. at 961.

Hughes argues the district court erred when it found the January 3, 4, and 18 crimes were the same or similar character. When determining whether the crimes charged

are of the "same or similar character," courts must determine whether the crimes have multiple commonalities, not merely the same classification of crimes charged. *State v. Smith-Parker*, 301 Kan. 132, 157, 340 P.3d 485 (2014).

*Ritz* is a good example of when crimes in separate incidents are the same or similar character under K.S.A. 22-3202(1). That case reflects Ritz led police on a high-speed chase in a stolen car through a residential neighborhood, but he ultimately crashed into a light pole. Less than three months later, Ritz led police on another high-speed chase in a stolen truck through a residential neighborhood. Sadly, he struck another vehicle and killed the other driver. The State filed the charges for both incidents in a single information, and Ritz moved to sever the crimes. The district court denied Ritz' motion, and the Kansas Supreme Court affirmed the lower court's decision based on the similarities of each incident. 305 Kan. at 964.

The district court here relied on *State v. Hanks*, 236 Kan. 524, 694 P.2d 407 (1985), *superseded by statute on other grounds as stated in State v. Borthwick*, 255 Kan. 899, 916, 880 P.2d 1261 (1994). In that case, Hanks made repeated unwanted romantic advances to the victim at their workplace. Months later, Hanks broke into her bedroom, groped, and kissed her. Several months afterwards, a man with a ski mask and knife broke into the victim's bedroom, ripped off her clothes, beat her, sexually assaulted her, and choked her into unconsciousness. The victim testified she believed the masked man was Hanks, and the jury convicted him for both incidents. Hanks appealed, arguing joinder of the incidents was inappropriate. The Kansas Supreme Court upheld the joinder of these incidents because they involved the same victim and defendant, arose in the same locale, and the crimes charged were similar in character. 236 Kan. at 533.

The crimes on January 3, 4, and 18, 2015, were the same or similar in character. See *Ritz*, 305 Kan. at 964. Over the night of January 3 and into the morning of January 4, Hughes repeatedly threw Miner to the ground, struck her face, and choked her until she

13

feigned unconsciousness. He emptied out her purse and took her phone. On January 18, Hughes took Miner's phone, broke into her home, dragged her by her ankles, beat her, and choked her into unconsciousness. Like in *Hanks*, the January incidents here involved the same victim and location. See 236 Kan. at 533. The district court did not err when it found both January 2015 incidents were the same or similar in character.

Having found no error and the charges were properly joined for trial, we do not need to consider whether Hughes faced prejudice from the merger of the January 2015 charges. See *Hurd*, 298 Kan. at 561.

*The district court did not err in consolidating the conspiracy charges in 15CR1836 with 15CR96 incidents.*

Hughes alleges the district court erred because it undervalued the prejudice of consolidating the charges. In doing so, Hughes inadvertently asks this court to skip the first two steps of the three-step review of joinder. Yet appellate courts cannot review possible prejudice of consolidation without first finding the district court erred in joining the charges. See *Hurd*, 298 Kan. at 561. Hughes does not claim the district court lacked substantial competent evidence, erred in its legal conclusion, or abused its discretion when it found 15CR1836 and 15CR96 were connected together or were part of a common scheme. Hughes therefore abandons those arguments. See *Arnett*, 307 Kan. at 650. Since there is no argument the district court erred in either of the first two steps of the joinder analysis, there is no error to consider, and we do not need to address whether the district court's joinder of 15CR1836 and 15CR96 was prejudicial. See *Hurd*, 298 Kan. at 561.

*There was no cumulative error.*

Hughes also raises a claim of cumulative error but having shown no errors, this claim fails. See *State v. Marshall,* 303 Kan. 438, 451, 362 P.3d 587 (2015); see also *Butler*, 307 Kan. at 868 (citing both no error and single error rules).

Affirmed.