No. 93,749

STATE OF KANSAS, *Appellee*, v. RICHARD SNOW, *Appellant.*

144 P.3d 729

Opinion filed October 27, 2006.

*Randall L. Hodgkinson*, of Kansas appellate defender office, argued the cause and was on the brief for the appellant.

*Jacqueline J. Spradling*, assistant district attorney, argued the cause, and *Steven J. Obermeier*, assistant district attorney, and *Phill Kline*, attorney general, were on the brief for the appellee.

The opinion of the court was delivered by

ROSEN, J.: Richard Snow appeals his convictions and sentences for multiple counts of nonresidential burglary, theft, and criminal damage to property for a string of burglaries at various businesses in Johnson County. Snow attacks his convictions, claiming that the district court improperly admitted evidence, erroneously endorsed a witness, permitted the prosecutor to commit misconduct, and denied his right to a fair trial by cumulative errors. Snow also attacks his sentence, asserting that the district court erroneously calculated his maximum controlling sentence, sentenced him based on an unconstitutional statute, increased his sentence based on

vague, nonstatutory aggravating factors, enhanced his sentence using aggravating factors already included in the severity level of the crime, improperly included his criminal history in calculating his sentence, and violated his Eighth Amendment rights by sentencing him to consecutive misdemeanor sentences following his felony sentences.

## FACTS

Richard Snow, his brother Robert Snow, and their friend Charles Miller broke into Sears, Mid-America Golf and Equipment, the Bushnell Factory Outlet, Golf Discount, and Golf Stop in Johnson County and stole various items valued at over $60,800. The trio also stole a van valued at nearly $5,000 to assist in committing the thefts. When Charles Miller was arrested, he confessed to these crimes and advised police that Richard and Robert Snow were his accomplices. The State offered Miller immunity from prosecution based on his statements. Thereafter, Richard Snow was charged with six counts of burglary, seven counts of theft, two counts of felony criminal damage to property, and four counts of misdemeanor criminal damage to property. The State filed a motion for an upward dispositional and durational departure sentence.

While his charges in this case were pending, Snow was incarcerated in Saint Joseph, Missouri, at the Western Reception, Diagnostic and Correctional Center (WRDCC) for other, unrelated crimes in Missouri. Snow called his bail bondsman from the WRDCC. The phone call was automatically recorded by the WRDCC phone system, and a phone monitor listened to the conversation. The phone monitor identified Snow as the caller by checking the personal identification number (PIN) used to make the call. The phone monitor also heard Snow identify himself by name during the conversation. Among other things, Snow told his bondsman that he could not be identified as a participant in the Johnson County burglaries because he did not remove his mask or gloves until after he and his accomplices had left the businesses' parking lots. Snow further indicated his concern that Charles Miller would talk to police. Snow laughed when the bondsman warned

him about making statements on the phone because the calls were recorded.

In addition to the statements Snow made to his bail bondsman, Snow also talked to Patrick Humble, a fellow inmate incarcerated with Snow in the Johnson County jail. Snow met Humble in the law library and bragged that he, his brother Robert, and Charles Miller had burglarized several businesses in Johnson County. Snow also told Humble about the taped phone conversation with Snow's bail bondsman, stating that he would not be identified as the caller because he had given out his PIN to other inmates.

At trial, the State presented testimony from Snow's accomplice, Charles Miller, and Snow's fellow inmate, Patrick Humble. In addition, the State introduced the recording of the phone conversation between Snow and his bail bondsman. A jury convicted Snow of all 19 counts, including 15 felony counts for nonresidential burglary, theft, and criminal damage to property, and 4 counts of misdemeanor criminal damage to property.

After the jury returned its verdict, the district court held a separate sentencing hearing for the jury to determine the existence of aggravating factors that could enhance Snow's sentence. The jury found beyond a reasonable doubt that Snow was not amenable to probation, posed a significant risk to the community, would more likely than not reoffend, and posed a risk of harm to the fact witnesses against him.

At sentencing, the district court used one of Snow's nonresidential burglary convictions, a severity level 7 felony, as the primary crime for calculating Snow's sentence. Based on Snow's criminal history score of E, the district court determined that Snow's presumptive sentence for nonresidential burglary was probation. However, the district court noted that Snow was on probation when he committed the crimes in this case and applied the special rule in K.S.A. 2005 Supp. 21-4603d(f), which permits the district court to impose a prison sentence in a presumptive probation case without a dispositional departure when the crime was committed while the defendant was on probation. The district court then granted the State's motion for a durational departure, relying pri-

marily on Snow's lack of amenability to probation as justification. The district court issued Snow's sentence, stating:

"I will adopt a sentence on the underlying Count One, burglary charge, of 23 months, which is the maximum [presumptive] sentence allowed. The Court will make the remainder of the sentences the aggravated number as found in each of the sentencing grid boxes for the felony counts, and I will order that they be run consecutive.

"The court is denying probation as an effect both of granting the motion and of application of the Special Rule. The sentence will then on the felonies be the maximum that is allowed, which is 92 months.

"There are four misdemeanor charges on which a six-month sentence can be rendered. The Court will render the maximum six-month sentence on each of those and will provide that they too be consecutive to the underlying felony sentences."

Snow brings this direct appeal of his convictions and sentences. We transferred the matter to this court on our own motion pursuant to K.S.A. 20-3018(c).

## ANALYSIS

### Convictions

*Admission of taped telephone conversation*

Snow claims that the district court improperly admitted the recording of the telephone conversation between himself and his bondsman. Snow raises three arguments to support his claim. First, Snow argues that the State lacked the proper foundation for the audio recording. Second, Snow asserts that the admission of the recording violated the Confrontation Clause of the Sixth Amendment to the United States Constitution. Third, Snow contends that the recording included evidence of other bad acts.

When determining whether evidence is erroneously admitted, this court first determines whether the evidence was relevant. If the evidence is relevant, the court applies the evidentiary rules either as a matter of law or judicial discretion depending on the rule in question. *State v. Engelhardt*, 280 Kan. 113, 126, 119 P.3d 1148 (2005).

For his first argument, Snow asserts that the State failed to establish the proper foundation for the audio recording. The party seeking to admit an audio recording must establish the following

foundational evidence regarding the recording before it can be admitted:

(1) demonstrate that the recording device was capable of recording sound;

(2) demonstrate that the operator of the device was competent in operating the device;

(3) establish the authenticity and correctness of the recording;

(4) demonstrate that no changes, additions, or deletions have been made to the recording;

(5) demonstrate the manner used to preserve the recording;

(6) identify the speakers; and

(7) demonstrate that the statements elicited were made voluntarily without any kind of inducement. *State v. Williams*, 235 Kan. 485, 491, 681 P.2d 660 (1984).

Snow limits his argument to the authenticity and correctness of the recording. Thus, our analysis will focus solely on this factor. Snow argues that the authenticity and the correctness of the recording were not proven because the phone monitors at the WRDCC did not listen to the call as it occurred. Snow relies on *Williams* for the proposition that the phone monitor had to listen to the original call while it occurred rather than listening to an automatic recording of the call. However, *Williams* does not stand for this proposition.

In *Williams*, the defendant claimed that the State failed to establish an adequate foundation for admitting an audio recording for a 911 call made during a rape. 235 Kan. at 490-91. The issue was whether the State established the authenticity and correctness of a cassette tape recording that had been rerecorded from a master reel-to-reel tape that automatically recorded all incoming 911 calls as they occurred. The *Williams* court concluded that the rerecorded cassette tape was sufficiently authenticated because the operator who copied the tape listened as the master tape was rerecorded onto the cassette tape. The operator who copied the tape and the dispatcher who took the call both testified that the rerecorded tape admitted into evidence was an accurate copy of the master reel-to-reel tape. 235 Kan. at 491-92. Thus, *Williams* stands for the proposition that rerecorded conversations may be admitted

into evidence if a witness can testify that the rerecording is the same as the original recording. See 235 Kan. at 492.

The State called the WRDCC phone monitor as a witness to establish the foundation for the recorded conversation. Although the record does not explicitly establish that the WRDCC phone monitor listened to the call as it occurred, there is evidence to support that inference. The phone monitor testified that his job included listening to live and prerecorded phone conversations. In regards to Snow's phone call with his bail bondsman, the phone monitor testified that he verified Snow's identity as the caller by checking the inmate PIN at the beginning of the call. The phone monitor then listened *"during* the call and got [a] positive identification" when Snow identified himself by name as "Richard Snow," and the bondsman identified the caller as "Richard Snowman." Before the call was complete, the phone monitor double checked the identification using the PIN and cross-referenced that information with Snow's cell assignment to verify that the call was originating from the location of Snow's cell. When the call was over, the phone monitor prepared an interoffice communication to alert an investigator and downloaded the call to a computer folder to separate it from the other calls recorded at the facility. The phone monitor testified that the recorded conversation introduced by the State was the same as the conversation he had heard earlier.

Snow focuses on another portion of the phone monitor's testimony where the phone monitor stated: "After I matched up the identification number to—into the system to show that it belonged to Richard Snow, *I went back to the call,* matched it up to a known that was used from that wing identical to Mr. Snow's where he was assigned, listened during the call and got positive identification." (Emphasis added.) Based on the highlighted comment, Snow argues that the phone monitor was not listening to the live conversation. As a result, Snow argues that the phone monitor cannot testify as to whether there were any changes, additions, or deletions from the original conversation. The phone monitor can only testify about whether there were changes, additions, or deletions to the recording of the conversation.

Snow urges us to apply a de novo standard of review, citing *State v. White*, 279 Kan. 326, 332, 109 P.3d 1199 (2005). In *White*, this court applied a de novo standard of review to determine whether the trial court had properly excluded expert testimony. The *White* court applied the de novo standard because it was interpreting a statute, evaluating whether the district court applied the proper legal test, and addressing constitutional considerations. 279 Kan. at 332-33. Snow does not seek the interpretation of a statute, question the propriety of the legal test used by the district court, or raise constitutional considerations. Thus, *White* is inapposite in determining the proper standard of review in this case.

We find more guidance regarding the appropriate standard of review for this issue in *Engelhardt*. In *Engelhardt*, the rule at issue involved the admission of other crimes evidence pursuant to K.S.A. 60-455. The *Engelhardt* court noted the statutory requirements for admitting other crimes evidence pursuant to K.S.A. 60-455 and stated: "As long as these requirements are met, we review the district judge's ruling under an abuse of discretion standard." 280 Kan. at 126.

The same standard of review applies in this case. We review the district court's consideration of whether the facts satisfy the proper legal requirements using an abuse of discretion standard. In a case such as this, when the evidence is ambiguous, we must give deference to the district court's factual findings unless the district court abused its discretion. Judicial discretion is abused when no reasonable person would adopt the view taken by the district court. *Engelhardt*, 280 Kan. at 144.

Because the evidence is ambiguous in this case, we find it reasonable for the district court to believe that the phone monitor listened to the live phone conversation rather than a recording of the conversation. Accordingly, the phone monitor was competent to testify regarding the authenticity and correctness of the audio recording. We find no merit in Snow's claim that the tape should not have been admitted for lack of foundation.

For his second argument regarding the admission of the phone recording, Snow contends that the conversation violated the Confrontation Clause. Issues related to the Confrontation Clause of

the Sixth Amendment raise questions of law, requiring us to apply a de novo standard of review. *State v. Adams*, 280 Kan. 494, 511, 124 P.3d 19 (2005).

Snow's argument relies on *Crawford v. Washington*, 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004), which held that testimonial statements of unavailable witnesses are inadmissible unless the defendant was afforded a prior opportunity to cross-examine those witnesses. Snow asserts that the statements as recorded on the WRDCC phone system must be considered testimonial because they were made under circumstances that would lead an objective person to believe that the statements would be available for use at trial. To establish his reasonable belief that the statements could be used at trial, Snow points to the bondsman's comment that the conversation was being recorded and could be used at Snow's trial. Snow argues that the recording could not be admitted because he did not have the right to confront the bondsman about the statements.

Snow's argument confuses the State's purpose for admitting the recording. The State sought to admit the recording for Snow's statements, not the bondsman's statements. The bondsman's statements were included to provide context to Snow's statements but were not admitted to prove the truth of the matter asserted. As a result, the bondsman's statements were not hearsay and did not infringe on Snow's Sixth Amendment right of confrontation.

In *State v. Torres*, 280 Kan. 309, 319, 121 P.3d 429 (2005), the defendant argued that the State violated his right to confrontation by admitting his statements to law enforcement officers. Torres argued that the admission of these statements required him to decide between waiving his constitutional right against self-incrimination or his constitutional right to confront witnesses. The *Torres* court concluded that the two rights were not conflicting. Noting that "confronting oneself" is not a right guaranteed by the Sixth Amendment, the *Torres* court concluded that Torres' statements had been properly admitted at his trial. 280 Kan. at 320; see also *Adams*, 280 Kan. at 511 (relying on *Torres* and holding that defendant's confession to law enforcement officers was admissible).

Excluding the recorded jailhouse phone conversation pursuant to the Confrontation Clause in this case would require us to recognize a constitutional right to "confront oneself." We have previously rejected the right to confront oneself in *Torres*. Because the Confrontation Clause does not grant Snow the right to confront himself, the district court did not violate Snow's constitutional right to confront the witnesses against him by admitting the recording of Snow's jailhouse phone conversation with his bail bondsman.

For his third argument, Snow attacks the admission of his jailhouse phone conversation on the basis that it contained unredacted references to other bad acts. Snow highlights references to him being "in jail again," having a bunch of warrants in Kansas, and being sentenced to 22 months in Missouri. Although the district court gave a limiting instruction regarding the use of the tape, Snow argues that the tape could have been redacted to eliminate those references.

In reviewing the admission of evidence, we must first determine whether the evidence is relevant to any disputed material issues. *Engelhardt*, 280 Kan. at 126. Relevant evidence is any "evidence having any tendency in reason to prove any material fact." K.S.A. 60-401(b). The material facts at issue in this case included the elements for the crimes of nonresidential burglary, theft, and criminal damage to property. None of those crimes require the State to prove that the defendant had been convicted of another crime, charged with another crime, or sentenced for another crime. See K.S.A. 2005 Supp. 21-3701; K.S.A. 21-3715; K.S.A. 21-3720.

Because the crimes at issue in this case do not require proof that Snow had been incarcerated or subject to other warrants, the evidence of Snow's other crimes was irrelevant. The trial court should have redacted any statements pertaining to Snow's other crimes or bad acts from the audio recording. Failure to redact the recording was error. However, we conclude that the error was harmless in light of the other evidence presented against Snow. See *Engelhardt*, 280 Kan. at 130 (holding that the defendant's mugshot was irrelevant and concluding that the district court erred in admitting it, but refusing to reverse defendant's conviction because the error was harmless). Miller testified that he and Snow committed the

crimes. Snow also bragged about participating in the crimes to Patrick Humble.

Moreover, the district court's limiting instruction mitigated the prejudice resulting from the irrelevant evidence. See *State v. Ross*, 280 Kan. 878, 887-88, 127 P.3d 249 (2006) (concluding that a limiting instruction cured the prejudicial effect of admitting evidence that the defendant and one of defendant's witnesses were members of the same gang). Although the district court erred by not redacting references of Snow's other bad acts from the recording, we conclude that the error was harmless and does not require us to reverse Snow's convictions.

*Late Endorsement of a Witness*

For his second claim of error, Snow asserts that the district court erroneously allowed the State to endorse Patrick Humble as a witness on the eve of trial. Patrick Humble was in the Johnson County jail with Snow while Snow awaited trial. Although Humble was housed in another wing, he met Snow in the law library on several occasions beginning in November 2003. Snow bragged to Humble about burglarizing various Johnson County businesses. Humble informed the Johnson County deputies at the jail about his conversations with Snow in November 2003, but the Overland Park police did not contact Humble until January 9, 2004.

The State made an oral motion to endorse Humble as a witness on January 9, 2004. At the hearing on the motion, the State informed the court that Humble was in the process of being interviewed by law enforcement officers and the State would provide Snow's counsel with a copy of the interview as soon as possible. Snow objected to the State's motion to endorse Humble, claiming that he would either be denied the opportunity to investigate Humble's testimony or required to waive his right to a speedy trial. Finding that the State did not unreasonably delay endorsing the witness, the district court granted the State's motion. Snow's trial began on Monday, January 12, 2004. Snow now claims that the district court erred because the State knew about Humble's statements months before trial and did not provide him with the opportunity to investigate.

Pursuant to K.S.A. 2005 Supp. 22-3201(g), the prosecutor is required to endorse the names of all witnesses on the complaint, information, or indictment at the time it is filed. However, the district court may allow the prosecutor to endorse the names of other witnesses, who later became known, after the complaint, information, or indictment has been filed. K.S.A. 2005 Supp. 22-3201(g). We have interpreted K.S.A. 2005 Supp. 22-3201(g) to give the district court broad discretionary power in allowing the late endorsement of witnesses. As a result, the district court's decision to permit the late endorsement of a witness is reviewed using an abuse of discretion standard. *State v. Bloom*, 273 Kan. 291, 311-12, 44 P.3d 305 (2002).

The purpose of the endorsement rule is to prevent the defendant from being surprised and allow the defendant an opportunity to interview the witnesses before trial. 273 Kan. at 313. The main question is whether the endorsement of the witness prejudiced the defendant's rights. The court must consider whether the defendant was surprised by the witness and whether the testimony was critical. 273 Kan. at 311. Before we will reverse the district court, the defendant must show actual prejudice in his or her ability to defend against the charges. *State v. Thompson*, 232 Kan. 364, 367, 654 P.2d 453 (1982).

In *State v. Bryant*, 227 Kan. 385, 607 P.2d 66 (1980), the State sought to endorse a codefendant as a witness on the first day of trial. Although the codefendant had given a statement to the police approximately 1 month before the trial, the prosecutor was unaware of the codefendant's statement until the day of trial. The prosecutor immediately notified defense counsel and advised him of the State's intent to move for a late endorsement of the witness. The district court granted the State's motion with the condition that the prosecutor give defense counsel the transcript of the witness' statement, allow defense counsel to listen to the tape recording of the statement, and give defense counsel an opportunity to interview the witness. Although the defendant objected, he did not request a continuance. This court concluded that the district court did not abuse its discretion because the defendant failed to request a continuance and defendant's counsel vigorously cross-examined

the witness, highlighting discrepancies to impeach the codefendant's testimony. 227 Kan. at 386-88.

*Bryant* is factually similar to the facts in this case. Although Humble advised a Johnson County deputy at the jail about his conversation with Snow in November 2003, there is no indication that the Overland Park police were advised of Humble's statements until January 9, 2004, when an Overland Park police officer interviewed Humble. The State learned of Humble's statements on the same day. The State provided Snow's attorney with a copy of the videotaped interview as soon as it became available and a copy of Humble's criminal history. Humble was incarcerated in the Johnson County jail and available for defense counsel to interview prior to trial. Nevertheless, Snow did not request a continuance to investigate Humble's statements. Snow's defense counsel cross-examined Humble regarding his access to Snow's case file, including Snow's pleadings and police reports. Snow's counsel attempted to show that Humble's familiarity with the facts in Snow's case was based on Humble's review of Snow's file. Snow's defense counsel also cross-examined Humble regarding his motive for testifying against Snow, highlighting Humble's request for drug and alcohol treatment rather than prison on a pending sentence.

Like the defendant in *Bryant*, Snow cannot claim that he was surprised by Humble's testimony. The State gave Snow as much notice as possible under the circumstances, and Snow refused to continue the matter to investigate further. Moreover, Humble's testimony was not critical for Snow's conviction. Although Humble's testimony is important because it corroborates other testimony, it was not necessary to establish any of the elements of the charged offenses. Snow bears the burden of establishing actual prejudice to his ability to defend against the charges. See *Thompson*, 232 Kan. at 367. He has failed to carry his burden. The trial court did not abuse its discretion by allowing the State to endorse Humble as a witness on the eve of trial.

### Prosecutorial Misconduct

Next, Snow asserts that the prosecutor denied him a fair trial by disparaging him for exercising his constitutional right to a jury trial.

Snow specifically complains of two comments the prosecutor made to begin and end her closing argument. The prosecutor began her closing argument by stating:

"[M]embers of the jury, there may be some of you who are sitting there thinking, why have we given two days to listen to this evidence? And the answer is simply this: Everyone who's charged with a crime in this country has an absolute right to a jury trial if that's what they demand. The defendant has indicated he wants a jury trial, and now he's had it. Despite the amount of evidence that might be there against them, if he wants it, I have to put it on, and we've done that."

The prosecutor closed her argument stating: "Now, the defendant wants his jury trial, he's had his jury trial, and its time to put an end to this nonsense."

" 'When reviewing an allegation of prosecutorial misconduct, an appellate court applies a two-step analysis to determine whether a prosecutor's comments have denied a defendant his or her constitutional right to a fair trial. First, the court must determine whether the remarks were outside the considerable latitude that the prosecutor is allowed in commenting on the evidence. Second, the court must decide whether the comments were so gross and flagrant as to prejudice the jury against the defendant and deny him or her a fair trial, thereby constituting plain error requiring reversal.' " *State v. Baker*, 281 Kan. 997, 1009-10, 135 P.3d 1098 (2006) (quoting *State v. Harris*, 279 Kan. 163, 173, 105 P.3d 1258 [2005]).

As a fundamental rule for closing argument, prosecutors must confine their remarks to matters in evidence. Although prosecutors are given wide latitude in commenting on the evidence and drawing reasonable inferences from the evidence, they are not permitted to discuss matters outside the evidence. *Baker*, 281 Kan. at 1012.

In its brief, the State appears to concede that the prosecutor's comments were outside the considerable latitude prosecutors are allowed in commenting on the evidence. The State confined its argument to the second prong of the test, asserting that the comments were not so gross and flagrant as to deny Snow his right to a fair trial. Relying on the district court to monitor the prosecutor's comments, the State concluded, without analysis, that the comments did not show ill will and did not prejudice the jury against Snow.

At oral argument, the State argued that the comments were not outside the wide latitude prosecutors are allowed during closing argument. The State argued that the prosecutor was simply highlighting Snow's right to a jury trial and encouraging the jury to go directly into deliberations.

In *State v. Tosh*, 278 Kan. 83, 91, 91 P.3d 1204 (2004), the prosecutor asked the jury to think about why the defendant requested a jury trial after confessing to the crime. This court determined that the prosecutor's comment improperly injected a matter outside the evidence into the jury's deliberations and concluded that the comment was outside the wide latitude given to prosecutors. 278 Kan. at 91. Although the *Tosh* court found the prosecutor's comment to be misconduct, it mainly relied upon the prosecutor's cross-examination of the defendant in reversing the defendant's conviction. 278 Kan. at 94-98.

Contrary to the State's argument, we believe the prosecutor's comments in this case also injected a matter outside the evidence, inferring that Snow should have acceded to the State's evidence and waived his right to a fair trial because of the strength of the State's evidence against him. Because the prosecutor's comment was outside the wide latitude given to prosecutors, we must proceed to the second step in the analysis—whether the comments were so gross and flagrant as to prejudice the jury against Snow and deny him a fair trial.

In *Tosh*, this court clarified the second step in the prosecutorial misconduct analysis, noting that it requires a particularized harmlessness inquiry utilizing the following three factors:

" '(1) whether the misconduct is so gross and flagrant as to deny the accused a fair trial; (2) whether the remarks show ill will on the prosecutor's part; and (3) whether the evidence against the defendant is of such a direct and overwhelming nature that the misconduct would likely have little weight in the minds of the jurors.' " *Tosh*, 278 Kan. at 93.

Besides implying that Snow should have waived his right to a trial, the prosecutor's comment in this case disparages the juror's civic duty by calling the trial "nonsense." We believe that these comments demonstrate ill will toward Snow by implying that he had wasted the prosecutor's and the jury's time because he exer-

cised his constitutional rights. Even more alarming was the prosecutor's assertion at oral argument that these comments were proper, clearly demonstrating an insensitivity to the duties of prosecutors so eloquently stated in *State v. Pabst*, 268 Kan. 501, 510, 996 P.2d 321 (2000):

> "A prosecutor is a servant of the law and a representative of the people of Kansas. We are unable to locate an excuse for a prosecutor's failure to understand the remarkable responsibility he or she undertakes when rising in a courtroom to announce an appearance for the State of Kansas. Instructional materials abound on this topic. Sixty-five years ago the United States Supreme Court said that the prosecutor represents 'a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.' *Berger v. United States*, 295 U.S. 78, 88, 79 L. Ed. 1314, 55 S. Ct. 629 (1935)."

In spite of this transgression, the comments were brief in the context of the trial and probably had little if any weight in the minds of the jurors when considered in light of the evidence presented. Although the prosecutor's comments were insulting, demeaning, and unprofessional, we do not believe that they rise to the level of the prosecutor's misconduct in *Tosh* and do not require the reversal of Snow's conviction.

*Cumulative Error*

Snow's final complaint regarding his convictions is that the district court denied him a fair trial by allowing cumulative errors.

> " ' " 'Cumulative trial errors, when considered collectively, may be so great as to require reversal of the defendant's conviction. The test is whether the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. No prejudicial error may be found upon this cumulative effect rule, however, if the evidence is overwhelming against the defendant.' " ' " *Baker*, 281 Kan. at 1017.

We find no support for Snow's claim that cumulative errors denied him a fair trial.

## Sentencing

*Maximum Controlling Sentence*

Finding no errors that require us to reverse Snow's convictions, we now consider Snow's arguments regarding his sentence. Snow

first complains that the district court erred when it calculated his maximum controlling sentence. Snow relies on K.S.A. 2005 Supp. 21-4720, which provides in pertinent part:

"(b) The sentencing judge shall otherwise have discretion to impose concurrent or consecutive sentences in multiple conviction cases. The sentencing judge shall state on the record if the sentence is to be served concurrently or consecutively. In cases where consecutive sentences may be imposed by the sentencing judge, the following shall apply:

. . . .

(4) The total prison sentence imposed in a case involving multiple convictions arising from multiple counts within an information, complaint or indictment cannot exceed twice the base sentence. This limit shall apply only to the total sentence, and it shall not be necessary to reduce the duration of any of the nonbase sentences imposed to be served consecutively to the base sentence. The postrelease supervision term will reflect only the longest such term assigned to any of the crimes for which consecutive sentences are imposed. Supervision periods will not be aggregated.

. . . .

"(c) The following shall apply for a departure from the presumptive sentence based on aggravating factors within the context of consecutive sentences:

(1) The court may depart from the presumptive limits for consecutive sentences only if the judge finds substantial and compelling reasons to impose a departure sentence for any of the individual crimes being sentenced consecutively.

(2) When a departure sentence is imposed for any of the individual crimes sentenced consecutively, the imprisonment term of that departure sentence shall not exceed twice the maximum presumptive imprisonment term that may be imposed for that crime.

(3) The total imprisonment term of the consecutive sentences, including the imprisonment term for the departure crime, shall not exceed twice the maximum presumptive imprisonment term of the departure sentence following aggravation."

The interpretation of a statute is a question of law subject to unlimited review. *State v. McCurry*, 279 Kan. 118, 121, 105 P.3d 1247 (2005). According to the fundamental rule of statutory construction, the intent of the legislature governs when that intent can be ascertained. We must give effect to the legislature's intent as expressed by the language in the statute when it is plain and unambiguous. Criminal statutes must be strictly construed in favor of the accused. Any reasonable doubt regarding the meaning of the statute is resolved in favor of the accused. Nevertheless, judicial

interpretation must be sensible and reasonable to effect the legislative design and intent. 279 Kan. at 121.

Snow's criminal history score was E. The district court used one of Snow's convictions for nonresidential burglary, a level 7 nondrug felony, as Snow's base sentence and determined that the presumptive sentence for Snow's base crime ranged from 19 months to 23 months. Although the district court granted the State's motion for an upward durational departure, it did not give Snow a departure reflected in the base sentence. Rather, the district court ordered a base sentence of 23 months, which was the aggravated presumptive sentence. The district court then imposed the aggravated presumptive sentence for each of the remaining 14 felony counts and ordered all of the sentences to run consecutively. The consecutive total for all of Snow's felony counts is 187 months.

However, Snow will not have to serve all of his consecutive sentences because K.S.A. 2005 Supp. 21-4720 limits the total length of a defendant's consecutive sentences for crimes charged in the same information, complaint, or indictment. Snow argues that pursuant to K.S.A. 2005 Supp. 21-4720(b)(4), the maximum total sentence is twice his base sentence. In this case, twice the base sentence is 46 months, not 92 months.

Pointing to the district court's decision to grant its motion for an upward durational departure, the State argues that K.S.A. 2005 Supp. 21-4720(c)(3) applies, limiting Snow's total sentence to twice the maximum term of Snow's allowable departure sentence. Pursuant to K.S.A. 21-4719(b)(2), a departure sentence can double the maximum presumptive sentence. The State asserts that Snow's departure sentence is twice his base sentence, or 46 months, and his maximum consecutive sentence is twice his departure sentence, or 92 months.

The State's analysis presumes a 46-month departure sentence for Snow's base sentence. However, the district court did not sentence Snow to an upward durational departure of 46 months for his base sentence. The district court only sentenced Snow to the maximum presumptive period of 23 months. Because there is no departure sentence to double under K.S.A. 2005 Supp. 21-4720(c)(3), Snow correctly asserts that K.S.A. 2005 Supp. 21-

4720(b)(4) applies, limiting Snow's maximum sentence to 46 months, which is twice his base sentence of 23 months.

Sentences that do not conform to the statutory provisions are illegal and must be remanded to the district court to correct the illegal sentence. *State v. Shaw*, 259 Kan. 3, 12, 910 P.2d 809 (1996). When a defendant is convicted on several counts, a single judgment should be pronounced declaring the full measure of punishment to be imposed for all of the offenses. *State v. Woodbury*, 133 Kan. 1, 2, 298 Pac. 794 (1931) (concluding that resentencing for all 10 counts was proper even though only 7 of the counts had been sentenced incorrectly). When the defendant's sentence violates the maximum consecutive sentence allowed by K.S.A. 2005 Supp. 21-4720, the district court can resentence the defendant for all counts and change the base sentence to reflect aggravated durational departure factors previously found to increase the total consecutive sentence pursuant to K.S.A. 2005 Supp. 21-4720. *State v. Baldwin*, 24 Kan. App. 2d 12, 14, 941 P.2d 422 (1997). Accordingly, we vacate Snow's sentence and remand this matter to the district court for resentencing.

Snow raises several other issues regarding his sentence. Snow attacks the constitutionality of K.S.A. 2005 Supp. 21-4720, the use of nonstatutory aggravating factors, the use of aggravating factors included in the severity level of the crime, the application of Snow's criminal history score, and the constitutionality of Snow's misdemeanor sentences. Although we are remanding the matter for resentencing, we will address Snow's remaining issues because of their impact on Snow's new sentence.

*Constitutionality of K.S.A. 2005 Supp. 21-4720(c)*

Snow claims that K.S.A. 2005 Supp. 21-4720(c) is unconstitutional because it allows the district court to enhance the defendant's sentence based on its own factual findings in violation of *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), and *State v. Gould*, 271 Kan. 394, 23 P.3d 801 (2001). Snow failed to raise this argument before the district court. Generally, constitutional issues that are not raised before the district court are not properly before this court. However, there is an ex-

ception when the newly asserted theory is strictly a question of law and its consideration is necessary to serve the ends of justice. *State v. Papen*, 274 Kan. 149, 161-62, 50 P.3d 37 (2002).

The *Papen* court refused to consider the defendant's issue regarding the constitutionality of K.S.A. 2001 Supp. 21-4636(f) (hard 40/50 sentencing aggravating factors) because the aspects of the statute complained of by the defendant were not applicable to his case. The same is true in this case. Snow argues that K.S.A. 2005 Supp. 21-4720(c)(1) is unconstitutional because it allows the judge to depart from the "presumptive limits for consecutive sentences only if the judge finds substantial and compelling reasons," without requiring a jury to make the factual findings in support of an enhanced sentence. However, this language in K.S.A. 2005 Supp. 21-4720(c) is not applicable to Snow's sentence because the district court departed based on aggravating factors found by a jury. Essentially, Snow is highlighting a technical defect in K.S.A. 2005 Supp. 21-4720(c)(1) which has not been changed since the legislature modified the sentence enhancement statutes due to *Apprendi*. Nevertheless, defendants, like Snow, for whom a statute is constitutionally applied cannot challenge the constitutionality of the statute on the grounds that the statute may conceivably be applied unconstitutionally in circumstances other than those before the court. *Papen*, 274 Kan. at 162. Because Snow has no standing to raise the constitutionality of K.S.A. 2005 Supp. 21-4720(c), we need not consider the constitutionality of the statute to serve the ends of justice.

*Nonstatutory Aggravating Factors*

Next, Snow asserts that his durational departure sentence violates his right to due process because the aggravating factors relied upon by the district court are not specifically enumerated in K.S.A. 2005 Supp. 21-4716(c)(2). Snow asserts that any unlisted factors are void because they fail to provide fair warning regarding the proscribed aggravating conduct. According to Snow, criminal defendants cannot execute their unlawful conduct in a manner subject to lesser penalties if they are not statutorily informed regarding the manner of committing crimes subject to increased penalties.

Under Snow's analysis, he would have chosen to commit the crime in a different way if he had known that his method of committing the crime would be punished more severely.

Snow failed to raise this issue before the district court. Constitutional issues asserted for the first time on appeal are not properly before this court, unless there is a newly asserted theory that is strictly a question of law and its consideration is necessary to serve the ends of justice. *Papen*, 274 Kan. at 161-62. Snow fails to argue how the resolution of this issue will serve the ends of justice. Consequently, we decline to address the merits of Snow's argument.

*Aggravating Factors Included in the Severity Level*

Snow further argues that the district court improperly enhanced his sentence based on aggravating factors that were included in the severity level of the crime. The district court in this case submitted the following four aggravating factors to the jury:

"1. The defendant is not amenable to probation.
"2. The defendant poses a significant risk to the community.
"3. If granted probation, the defendant would, more likely than not, re-offend.
"4. If released, the defendant poses a risk of harm to the fact witnesses in this case."

The jury found beyond a reasonable doubt that the State established evidence of all four of these factors. The district court, however, relied only on the first three, stating:

"The first one found by the jury was that the defendant was not amenable to probation. There was not merely ample evidence to support that, there was phenomenally persuasive, compelling, and dramatic evidence and testimony to support that factor.

. . . .

"The jury also found that the defendant poses a significant risk to the community, and that if granted probation, the defendant would more likely than not reoffend. The Court also agrees that there was ample evidence to support those findings of the jury.

"There is less clarity in the case law in Kansas as to whether either of those [two] would support an upward durational or dispositional departure. It is correct, as [Snow's counsel] argues, that the sentencing guidelines themselves certainly factor in some of the same information that would be contained in a finding on those two factors.

"The Court will also adopt those factors, but I will state as clearly as I can that the mere finding in this case of lack of amenability to probation would, even in the absence of any of the other factors having been found by the jury or the Court, support the upward durational and dispositional departure."

In *State v. Rodriguez*, 269 Kan. 633, 646, 8 P.3d 712 (2000), this court noted that 21-4716 provides a nonexclusive list of aggravating factors and stated that "[t]he trial court may use other, nonstatutory factors as long as they are supported by the evidence and consistent with the intent and purposes of the guidelines." The *Rodriguez* court upheld a dispositional departure sentence based on nonamenability to probation, an aggravating factor not specifically enumerated in K.S.A. 2005 Supp. 21-4716(c)(2). 269 Kan. at 648; see also *State v. Sewell*, 25 Kan. App. 2d 731, 732, 971 P.2d 1201 (1998) (approving nonamenability to probation as an aggravating factor); *State v. Meyer*, 25 Kan. App. 2d 195, 197, 960 P.2d 261, *rev. denied* 265 Kan. 888 (1998) (affirming upward dispositional departure based on nonamenability to probation); *State v. Billington*, 24 Kan. App. 2d 759, 763, 953 P.2d 1059 (1998) (holding that nonamenability to probation and absconding supported defendant's upward dispositional departure sentence); *State v. Trimble*, 21 Kan. App. 2d 32, 38, 894 P.2d 920 (1995) (upholding dispositional departure sentence for nonamenability to probation). In *State v. Yardley*, 267 Kan. 37, 44, 978 P.2d 886 (1999), this court affirmed an upward durational departure based on the defendant's nonamenability to probation, future dangerousness, and the randomness of the crimes.

Snow's argument fails to recognize that, although the district court found evidentiary support for three of the four aggravating factors found by the jury, it relied on Snow's nonamenability to probation to support the departure sentence. The comments of the court at the time of sentencing, not the journal entry, govern as to the reasons for the departure. *State v. Jackson*, 262 Kan. 119, 135, 936 P.2d 761 (1997). *Rodriguez* and *Yardley* support the district court's decision to grant the State's motion for a durational departure sentence based on nonamenability to probation. Snow fails to cite any contrary authority. As a result, we find no merit in Snow's claim that the aggravating factors supporting his upward durational

departure are based on facts included in the severity level of the crimes.

*Criminal History Score*

Snow argues that this court cannot use his criminal history score to enhance his sentence. Snow contends that his criminal history score must be proven beyond a reasonable doubt to a jury before it can be used in calculating his sentence. Snow relies on *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000); *Blakely v. Washington*, 542 U.S. 296, 159 L. Ed. 2d 403, 124 S. Ct. 2531 (2004); and *Shepard v. United States*, 544 U.S. 13, 161 L. Ed. 2d 205, 125 S. Ct. 1254 (2005). We have recently rejected Snow's argument in *State v. Lackey*, 280 Kan. 190, 239, 120 P.3d 332 (2005), *cert. denied* 126 S. Ct. 1653 (2006). Snow fails to distinguish *Lackey*. Thus, there is no merit in Snow's argument.

*Consecutive Misdemeanor Sentences*

Finally, Snow claims that the district court erred by ordering his misdemeanor sentences to run consecutive to each other and consecutive to his felony sentences. Snow argues that the consecutive misdemeanor sentences will result in a total sentence that exceeds the maximum penalty for consecutive sentences pursuant to K.S.A. 2005 Supp. 21-4720. Snow argues that he is subject to an increased penalty because he committed lesser crimes and that the consecutive misdemeanor sentences violate his right against cruel and unusual punishment under the Eighth Amendment to the United States Constitution.

The district court imposed the aggravated presumptive sentence for each of Snow's 15 felony counts and ordered all of the sentences to run consecutively, resulting in a total sentence of 187 months. Pursuant to K.S.A. 2005 Supp. 21-4720(b), Snow's maximum controlling felony sentence is limited to twice his base sentence, which is much less than 187 months. However, K.S.A. 2005 Supp. 21-4720(b) does not apply to misdemeanor sentences. *State v. Huff*, 277 Kan. 195, 197-98, 83 P.3d 206 (2004). As a result, Snow's consecutive misdemeanor sentences are not truncated like his felony sentences. Snow argues if he had committed felony-level crim-

inal damage to property rather than misdemeanor-level criminal damage to property, he would have received a shorter total sentence. Snow complains that his total sentence is 2 years longer because he committed a lesser degree of criminal damage to property.

Snow's complaint attacks the proportionality of his misdemeanor sentence when compared with the total length that his sentence would have been if he had committed all felonies rather than some felonies and some misdemeanors. Relying on *State v. Freeman*, 223 Kan. 362, 366, 574 P.2d 950 (1978), for the proposition that the constitutionality of a sentence is a question of law, Snow asserts that this is a legal question involving an unlimited review. However, the issue in *Freeman* was the constitutionality of a sentencing statute. 223 Kan. at 363. Snow does not attack the constitutionality of the misdemeanor sentencing statutes. Rather, he claims that his particular sentence is unconstitutional. When the constitutionality of a sentence within the statutory limits is attacked but the statute itself is not attacked, this court reviews the sentencing court for an abuse of discretion. Generally, an appellate court will not interfere with a sentence that is within the statutory limits unless there are special circumstances indicating that the sentencing court abused its discretion. *State v. Tyler*, 251 Kan. 616, 647, 840 P.2d 413 (1992); *State v. Ramos*, 240 Kan. 485, 489, 731 P.2d 837 (1987).

Recent opinions from the United States Supreme Court have acknowledged that the Eighth Amendment only forbids extreme sentences that are "grossly disproportionate" to the crime. *Lockyer v. Andrade*, 538 U.S. 63, 73, 155 L. Ed. 2d 144, 123 S. Ct. 1166 (2003); *Ewing v. California*, 538 U.S. 11, 23-24, 155 L. Ed. 2d 108, 123 S. Ct. 1179 (2003). In *Lockyer*, the defendant claimed a violation of his Eighth Amendment rights because he received two consecutive sentences of 25 years to life for stealing videotapes worth approximately $150. However, the United States Supreme Court upheld the defendant's sentence, concluding that it was not grossly disproportionate. *Lockyer*, 538 U.S. at 76-77. Similarly, in *Ewing*, the Court affirmed a prison sentence of 25 years to life for a repeat felon who stole three golf clubs worth approximately $1,200. *Ewing*, 538 U.S. at 30-31.

Snow's 2-year jail sentence pales in comparison to the sentences in either *Ewing* or *Lockyer*. When this case is viewed using an abuse of discretion standard, Snow fails to scale the "grossly disproportionate" hurdle found in *Ewing* and *Lockyer*. As a result, we decline to analyze his claim any further.

However, we think it is necessary to point out that Snow's actual time incarcerated in either prison or jail for the 19 counts at issue in this case could be significantly less than the time the district court orders him to serve. If the district court orders the sentences for all of Snow's 15 felony counts to run consecutively, the total sentence imposed will exceed the maximum consecutive sentence allowed by K.S.A. 2005 Supp. 21-4720. By legislative grace, Snow's actual time of incarceration could be artificially truncated to less than half of the time actually imposed by the court. We find it disingenuous for Snow to argue that it is cruel and unusual punishment for the district court to order consecutive misdemeanor sentences when the total time of incarceration, including for the misdemeanor sentences, is still significantly less than the total actual time imposed by the district court.

We affirm Snow's convictions and vacate Snow's sentences. The matter is remanded to the district court for resentencing.